Carlos R. SANTIAGO, Plaintiff,

v.

SEA–LAND SERVICE, INC., Defendant.

Civ. No. 24–72.

United States District Court,
D. Puerto Rico.

Nov. 8, 1973.

Carmelo Avila-Trujillo, Santurce, P. R., for plaintiff.

Jose A. Fuste, San Juan, P. R., for defendant.

## MEMORANDUM ORDER

CANCIO, Chief Judge.

This case is before the court on a motion for partial judgment on the pleadings filed by defendant, Sea-Land Serv-

ice, Inc., dated March 2, 1973. The motion referred to prays that partial judgment on the pleadings be entered in this case striking the allegation contained in paragraph 5 of the Complaint which claims damages of a consequential nature which according to the request made by the defendant are not recoverable pursuant to a maritime contract of transportation as the one the object of this case.

The Court, after carefully examining the defendant's contention in this respect, is of the opinion that the position assumed by the defendant in said motion for partial judgment on the pleadings is correct and that a full exposition of the applicable law is warranted in this district where maritime litigation, specially relating to maritime contracts for transportation, is considerable.

According to the Complaint filed herein, and assuming the correctness of the facts contained in said Complaint, plaintiff, Carlos R. Santiago, contracted the services of the defendant, Sea-Land Service, Inc., for the transportation of a Dodge automobile from Puerto Rico to the Dominican Republic. In accordance with the allegations, the vehicle was supposed to arrive in the Dominican Republic on September 21, 1971, on board the M/V Tropic Eve. The same was consigned to Francisco Leonardo Peralta Fernández, with address in the Dominican Republic.

An examination of the allegations further shows that the aforementioned vehicle did not arrive nor has arrived on any date thereafter in the Dominican Republic. As a consequence of said act, the Complaint prays for the loss of value of the automobile equivalent to an amount claimed not to be less than $2,000.00 and also claims in allegation number 5 that the plaintiff lost the opportunity and benefit of using the automobile in the Dominican Republic during his frequent trips to said country, suffering mental and spiritual anguish by being deprived of the benefit and use of the vehicle, which amount of damages the plaintiff has estimated in $5,000.00.

In view of the allegations contained in the Complaint the defendant understood that partial judgment on the pleadings striking and/or dismissing the Complaint as to the damages claimed in allegation number 5 should be entered on its behalf, since the only measure of damages recoverable against the carrier, in this case the defendant, was market value of the automobile at the port of destination, which allegation of damage is also contained in the Complaint. As already stated, the Court is in agreement with the position taken by the defendant, Sea-Land Service, Inc.

I.

The fact that in maritime cases the courts are to apply Federal Maritime Law is a hornbook principle. The Constitution of the United States is silent as to the source of the substantive law to be applied in the federal district courts in cases of admiralty and maritime jurisdiction, that is, cases involving maritime contracts, maritime torts and all other causes of action traditionally embodied within the jurisdictional powers of federal courts to entertain maritime matters. During the colonial period the concept "jurisdiction" was frequently used to refer to a general authority to govern and not just to the scope of judicial authority. But it is reasonably clear, from both the wording of the Constitution and its legislative history, that the Constitutional Convention meant to refer to judicial authority only. See Article III of the Constitution of the United States, specifically Section 2 of said Article, which by its terms extends the judicial power of the United States to admiralty and maritime cases. See also Goodman, Eighteenth Century Conflict of Laws, 5 Amer.J. of Leg. Hist. 326 (1961). Nevertheless, obvious necessity buttressed by notions of the traditional independence of the laws of the sea, has led the constitutional language to be read to mean that there is a substantive maritime law in force and implicitly adopted in the United States to govern both at the federal and state

levels. It is a general uniform maritime law molded and modified to meet the needs of the New World. De Lovio v. Boit, 2 Gall. 398, Fed.Cas. # 3776 (Story). It is federal law, to some extent congressionally fixed, as it happens with the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 et seq., which applies *ex proprio vigore* to the case now before the court, but to a large extent enunciated by the federal courts and state courts dealing with admiralty matters, independent of statute or in absence of statute, whether exercising original exclusive jurisdiction within the meaning of 28 U.S.C. § 1333 in the case of federal courts, or exercising "saving to suitors" jurisdiction in the case of state courts or Commonwealth of Puerto Rico courts, pursuant to the aforementioned jurisdictional statute. Black, Admiralty Jurisdiction, 50 Colum.L.Rev. 259–262 (1950); Stimson, Swift v. Tyson, What Remains, What is State Law, 24 Corn. L.Q. 54 (1938).

In 1870 a change occurred in the Supreme Court of the United States and President Grant named Joseph P. Bradley to the Supreme Court to sit as Justice. Almost immediately he assumed the mantle of Justice Story as the chief admiralty authority in the United States Supreme Court. In the year 1875, and in the case of The Lottawanna, 88 U.S. (21 Wall.) 558, 22 L.Ed. 654 Justice Bradley undertook what has been termed the first complete analysis of the Admiralty Law since the days when it was reviewed as a branch of the Law of Nations. The principal question involved in the *Lottawanna* case was whether a maritime lien arose in favor of a home port furnisher of repairs and supplies. The same question had been answered negatively about fifty years earlier in The General Smith, 17 U.S. (4 Wheat.) 438, 4 L.Ed. 609 (1819). Counsel in *The Lottawanna* urged that *The General Smith* decision was contrary to the General Maritime Law and should consequently be overruled. Justice Bradley, in his opinion in the *Lottawanna* case found little difficulty to sustain that

*The General Smith* was no longer valid law. His opinion stated that, while it is true that there exists a great mass of maritime law which is the same in all commercial countries, at the same time the Maritime Law is only so far operative as law in any country as it is adopted by the laws and usages of that country. Therefore, the question of whether a home-port supplier was entitled to a maritime lien was a question of United States law, that is, of Federal Maritime Law, exclusively utilizing the basic principle of uniformity in so deciding.

Since the decision of Justice Bradley in the *Lottawanna* case, it has been taken as settled that United States courts and local courts of the states and, we add, of the Commonwealth of Puerto Rico, are not bound to follow any segment of maritime law that is not maritime national law. The concept of maritime national law is a concept of uniform application of legal principles to admiralty matters throughout the United States. Mr. Justice Holmes has put the issue in his sharp, drastic and precise method of opinion-writing, and said in the case of The Western Maid, 257 U.S. 419, 42 S.Ct. 159, 66 L.Ed. 299 (1922) that in deciding this question we must realize that however ancient may be the traditions of the Maritime Law, however diverse the sources from which it has been drawn, it derives its whole power from its having been accepted and adopted by the United States. To this Justice Holmes added that there is no mystic over law to which the United States must bow.

Notwithstanding all this, it is important to note that a great part of the federal state choice of laws tangled in maritime cases is intimately involved with the notion that federal maritime law is in some sense a brooding omnipresence over the sea. This idea of the brooding omnipresence, that is, the idea of the uniformity of the Federal Maritime Law under the American flag, was expressed by Chief Justice Marshall as early as 1928. At that time he expressed that admiralty cases do not arise under the

Constitution or laws of the United States, but are as old as navigation itself and that the Law of Admiralty, as it has existed for ages, is applied by our courts to the cases as they arise. American Insurance Co. v. Canter, 26 U.S. (1 Pet.) 511, 7 L.Ed. 242 (1828). It is clear that as to maritime matters the prevailing assumption has been that the constitutional grant of admiralty jurisdiction to the federal courts and to the local courts pursuant to the saving-to-suitors clause, presupposed the existence of an at large body of substantive federal maritime law to be drawn upon in deciding maritime cases. The weight of such an assumption in the choice of law cases has been great. Once it is assumed that the Constitution presupposed the existence of a body of maritime law, deciding that the law is binding in all courts, admiralty or common-law, is but a step. Stumberg, Maritime Cases in Common-Law Courts, 3 Tex.L.Rev. 246 (1925). If the body of legal principles adopted or created by the federal admiralty courts is merely another form of federal common law, mascarading under the title of General Maritime Law, then it has seemed obvious to many scholars that cases of admiralty and maritime jurisdiction must be covered by those principles, no matter what forum, state or federal, is charged with the task of deciding such cases. See Gilmore & Black, The Law of Admiralty, 1957, Sections 1–16 et seq., page 40 et seq.

Just as the Constitution does not specify the source of the substantive law to be applied by federal courts in cases of admiralty and maritime jurisdiction, the Judiciary Act of 1789, specifically Section 9 of said Act, which nowadays is contained in Section 133 of Title 28 of the United States Code, did not disclose the source or sources of the substantive law to be applied in those cases in which a remedy at common law was saved pursuant to the saving-to-suitors clause. The grant of admiralty jurisdiction was read to support the authority of federal judges to declare the federal substantive maritime law and the power of Congress to legislate for maritime matters. Stevens, Erie v. Tomking and the Uniform General Maritime Law, 64 Harv.L.Rev. 246 (1950).

An analogous development with regard to maritime cases in state courts would have been entirely possible. Indeed, if Justice Story's view that the Constitution compels the saving of a remedy where the common law is competent to give it is correct, if the Constitution preserves the jurisdiction of the common-law courts in the same manner as it grants authority to the Federal Government, then state judicial and legislative authority with respect to the articulation of substantive maritime principles would seem necessary to follow. That this development has not come to pass is a tribute to the potency of the powerfully felt requirement of international uniformity in the area of Maritime Law.

It has been said that the uniformity requirement is actually an elliptical description of the maritime laws and an essential insulation from the diverse and parochial tendencies of the local laws of the several states. Dickinson and Andrews, A Decade of Admiralty in the Supreme Court of the United States, 36 Calif.L.Rev. 169 (1948). The requirement of uniformity operates on two broad fronts: (1) it prescribes that the federal admiralty courts should proceed according to the national Maritime Law and limit their power to borrow local law by way of supplementation or modification thereof; and (2) it places analogous limitations on the power of local courts to apply local law to maritime matters which are to be decided pursuant to the federal substantive Maritime Law whether congressionally adopted or judicially construed. In relation to this second front it can be further stated that if a case is one of admiralty and maritime jurisdiction, the fact that it is brought in a state court—in the case of Puerto Rico in a court created by the Judiciary Act of the Commonwealth of Puerto Rico—the fact that it is brought in such court under the saving clause in

no way relaxes the need for application of a uniform substantive law. Statements to this effect are frequently made in eminently respectable quarters and are contained in decisions of this Court dealing with maritime matters. See for example, Currie, The Silver Oar and All That, 27 U.Chi.L.Rev. 1 (1959); Fireman's Insurance Co. of Newark v. Gulf Puerto Rico Lines, 349 F.Supp. 952 (Dist.P.R.1973). In the aforementioned Law Review article, Professor Currie states that there are no difficulties attending the question of what law, state or federal, applies in retirement cases, but that one thing is reasonably clear, that is, that in all maritime cases the same law, state or federal, is applied, whether the action is in a local court or a federal court. Rhode Island Insurance Co. v. Pope & Talbott Line, 78 D.P.R. 454 (1955); Commonwealth of Puerto Rico v. Sea-Land Service, Inc., 349 F.Supp. 964 (Dist.P.R.1973).

■ The fact that plaintiff's action is under a maritime contract of transportation pursuant to the Carriage of Goods by Sea Act, 46 U.S.C. 1300 et seq., can be plainly seen from the face of the Complaint. The movement of cargo was between Puerto Rico and the Dominican Republic, that is, a movement of cargo in foreign commerce. That without more brings into full force and effect the Carriage of Goods by Sea Act, 46 U.S.C. 1300 et seq.

## II.

It being established that pursuant to a maritime contract of transportation the rights and liabilities of all parties concerned are to be regulated by the courts pursuant to the terms and conditions of the contract of carriage, and taking into consideration the general Maritime Law of the United States which is of uniform application, let us examine what has been the measure of damages or how the courts have dealt with the measure of damages to be awarded in cases of lost or damaged merchandise or goods.

■ In general, the measure of damages in cargo claims has been mar-

ket value at the port of destination. St. Johns N. F. Shipping Corp. v. S. A. Compahnia Geral Commercial, 263 U.S. 119, 44 S.Ct. 30, 68 L.Ed. 201 (1923). In the event goods are damaged rather than lost entirely, the measure would be the difference between sound market value at the port of destination and the market value of the goods in the damaged condition. Holden v. The SS. Kendall Fish, 395 F.2d 910 (5th Cir. 1968); Elia Salzman Tobacco Co. v. SS. Mormacwind, 371 F.2d 537 (2nd Cir. 1967); Otis McAllister & Co. v. Skibs, 260 F.2d 181 (9th Cir. 1958), cert. den. 359 U.S. 915, 79 S.Ct. 584, 3 L.Ed.2d 576 (1959). When cargo is wrongfully delayed rather than actually damaged, the proper measure of damages is the difference between the market value of the goods at the time and place they should have arrived and the market value of the goods when they arrived. This principle is very well illustrated by the case of Atlantic Mutual Insurance Co. v. Poseidon Schiffahrt, 313 F.2d 872 (7th Cir. 1963), cert. den. 375 U.S. 819, 84 S.Ct. 56, 11 L.Ed.2d 53 (1963), which discusses generally the measure of damages in all three situations, that is, loss, damage and delay.

This basic rule is not complicated. The measure of damages is clear. The difficulty may lie in the application of the law to the facts in particular cases. The assessment of damages in particular situations has called for the development of lesser rules, the use of common sense and the creation of exceptions, all to the end that the shipper whose property has been affected be made whole. Before turning to the question of how market value is determined and some of the factors affecting and supplementing it, we shall consider a number of cases that are real or apparent exceptions to the general market value rule.

■ An obvious exception arises where there exists no market value at the destination port for the commodity damaged. In such event the nearest market is often used with the addition of the cost of getting the goods to that

market. In Sanib Corp. v. United Fruit Co., 74 F.Supp. 64 (S.D.N.Y.1947), there was damage to a shipment of banana powder upon its arrival at Tampa, Florida. The District Court found that there was no market value for banana powder at Tampa, so the court applied the New York market price with proper adjustment for the difference in freight and other necessary expenses.

■ Another rule is to apply when reconditioning of the damaged merchandise is feasible. Despite the fact that the market value of the commodity was decreased substantially by voyage damage, if restoration can be made at a modest cost so that the shipper realizes the market value of the product, the courts sometimes limit damages to such reconditioning costs. In Weirton Steel Co. v. Isbrandtsen-Moller Co., 126 F.2d 593 (2nd Cir. 1942) tin plate was reconditioned for about 10% of its depreciation in value, and the shipper was able to use it for its intended purpose. Even though the tin plate was not completely restored in appearance, only the reconditioning costs were awarded as damages since the shipper was able to dispose of the merchandise without economical loss.

In United States v. The Holland, 164 F.Supp. 741 (D.Md.1958), representing an exemption more apparent than real in nature, the United States as the shipper was awarded export price rather than domestic market value for wheat damages at Norfolk before leaving the country. Although the domestic market value of wheat was considerably higher than the export price the court found that the United States would have received only the export price for the wheat upon delivery abroad, and, since it could replace the wheat for the export price, its actual loss was the export price and not the market value at Norfolk.

At times, the courts simply make arbitrary adjustments to work substantial justice, all in conformity with the general rule of compensation of damages—that is, market value at the port of destination. In Pioneer Import Corp. v. The Lafcomo, 159 F.2d 654 (2nd Cir.

1947), cert. den. 331 U.S. 821, 67 S.Ct. 1310, 91 L.Ed. 1838 (1947), the court reduced the commodity by an arbitrary 20% from the market value of the seeds had they been shipped in refrigerated space. This adjustment was based upon an opinion that refrigerated pips (seeds) would have stored longer and could have been held for a higher market. The burden of these exceptions to the market value rule at destination is summed up in Illinois Central Railroad v. Crail, 281 U.S. 57, 50 S.Ct. 180, 74 L. Ed. 699 (1930). In that case, the Supreme Court of the United States stated that the test of market value is at best but a convenient means of getting at the loss suffered and that it may be discarded and other more accurate means restored to if, for special reasons, it is in effect or otherwise not applicable.

■ Various methods have been used to determine market value and the determination of said market value is not always a simple task for a judge or jury in a cargo claim. Thus, there is always the problem of proving market value prices at ports all over the world often on theoretical dates when goods should have arrived which can be the source of prolonged litigation. The solution to the problem is, of course the responsibility of the plaintiff, since he has the burden of proof as to the amount of the damages. Bussan Kaisha Ltd. v. American President Lines, Ltd., 265 F.2d 418 (2nd Cir. 1959). On occasions published listings for commodities such as sugar, grain, cotton or rubber constitute the best proof of market listings at the port of destination. On other occasions comparable sales are the best evidence of market value and in a large number of cases market value is actually determined by testimony of expert witnesses; the shipper himself which is familiar with the market, marine surveyors who have familiarized themselves with market conditions, etc. R. T. Jones Lumber Co. v. Roen SS. Co., 270 F.2d 456 (2nd Cir. 1959); Atlantic Mutual Insurance Company v. Poseidon Schiffahrt, 313 F. 2d 872 (7th Cir. 1963); Daido Line v.

Thomas P. González Corp., 299 F.2d 669 (9th Cir. 1962); Empresa Central Mercantil de Representaciones Ltda. v. Rep. of the United States of Brazil, 147 F. Supp. 778 (SDNY1957), aff'd 257 F.2d 747 (2nd Cir. 1958).

Whether the basis for market value set in a particular case is retail, wholesale, replacement, or even invoice value, it is not always susceptible of easy explanation. The courts usually select the value that is most in accord with basic principles of compensating or restoring the shipper, of making him whole. As a general provision, if goods are intended to be added to stock and no need exists for immediate replacement at retail costs or if no loss of sales at retail is shown the term market value would contemplate wholesale price. Illinois Central Railroad Co. v. Crail, 281 U.S. 57, 50 S.Ct. 180, 74 L.Ed. 699 (1930). Both Distributing Co. v. Reading Co., 168 F. 2d 967 (3rd Cir. 1948) and National Distillers Products Corp. v. Companhia Nacional de Navegacao, 107 F.Supp. 65, 1952 A.M.C. 1613 (E.D.Pa.1952) involved the loss of wine intended as addition to stock, and no necessity was shown for immediate replacement; hence, the wholesale rather than the retail price constituted the market value.

In McNeely & Price Co. v. Ellerman & Bucknall Co., 100 F.Supp. 339, 1951 A. M.C. 1620 (E.D.Pa.1951) a shipper, importing goat skins from India for processing into a finished product in the United States, was awarded damages for injury to the skins based upon the invoice price because of a failure to prove that the market value of the skins at destination was $1.00 per dozen more than invoice. The court indicated it probably would have used the higher market price had it been proven. The case does seem, however, to stand for the proposition that the wholesale price is the basis for the market value to a processor. On the other hand, the Fifth Circuit allowed the replacement cost, as representing the market value at destination, of thirteen pieces of structural steel. See Waterman SS. Corp. v. United States Smelting, Ref. & Mining Co., 155 F.2d 687, 1946 A.M.C. 997 (5th Cir. 1946).

Retail values, including anticipated profits, have been awarded where it has been satisfactorily shown that these were in fact the sums lost. In Goldenberg v. World Wide Shippers & Movers, Inc., 236 F.2d 198, 202 (7th Cir. 1956), the Seventh Circuit set out the rules governing loss of anticipated profits:

"Courts have refused to allow anticipated profits where they are so speculative as to be illusory . . . In Excelsior Motor Mfg. & Supply Co. v. Sound Equipment, 73 F.2d 725, 729 (7th Cir. 1934), cert. denied, 294 U.S. 706 [55 S.Ct. 352, 79 L.Ed. 1241] (1935) . . . discussing anticipated profits as a measure of contract damages, we said: '. . . It is not required that the profits be definitely and absolutely proved. The breach of the contract having prevented such profits from beng made, conclusive proof is impossible. The injured party is permitted to introduce evidence tending to establish the damage and no greater degree of certainty of proof is required than for any other fact essential to be established in a civil action.'"

One leading text writer expresses the rule as to profits in this way: "A fair margin of profit is included in arrived sound market value, but loss of special profits resulting from loss of markets and loss of profits on other goods usually cannot be included in the damages claimed because they are too remote." See W. Tetley, Marine Cargo Claims 82 (1965).

■ Under general contract law, a shipper would be entitled to retail market value, including anticipated profit, as his measure of damages (1) if the loss of such profit is direct, reasonably foreseeable by the carrier, and not realizable by substitution of other goods from stock, or (2) if for some reason he must replace the goods at retail. Otherwise, market value would normally be the wholesale price at destination.

A number of factors other than the market value of the goods enter into the award of damages to a successful cargo claimant. Some increase the award, some lessen it, and one or two could eliminate recovery altogether.

At times, there is damage to the cargo without real injury to the shipper. A case concerning several bales of Australian combed wool tops illustrated this situation. Stein v. United States Lines Co., 1957 A.M.C. 272 (S.D.N.Y.1956). The burlap covers and paper lining of the bales had been torn in transit, and the protruding wool tops had been soiled and apparently had depreciated. The shipper, however, sold the bales at market by sample; none were refused, nor were there refunds claimed despite the soiled condition. There being no pecuniary loss, the libel seeking damages was dismissed.

It should be recognized that some cargoes suffer a natural and normal deterioration or shrinkage en route, and proper allowance in the award must be made for this factor. Perishable commodities, for example, will usually sustain some deterioration over the period of a voyage. The Ninth Circuit took this fact into account in a case decided in 1962, entitled Daido Line v. Thomas P. González Corp., 299 F.2d 669, 1962 A.M.C. 1295 (9th Cir. 1962):

"The calculation of damages begins with the fair market value of the product at the time and place of intended arrival in the condition in which it would have arrived save for the carrier's negligence. This market price necessarily includes an appropriate discount for the normal deterioration of the type of product involved during the course of an ordinary voyage when shipped in good order and condition." At p. 676.

The same principle applies to natural shrinkage. In one case, entitled National Distillers Prods. Corp. v. Companhia Nacional de Navagacao, 107 F.Supp. 65, 1952 A.M.C. 1613 (E.D.Pa.1952), a 20 per cent allowance was made for natural shrinkage in wine on a voyage from Portugal to Brooklyn. In another case entitled Instituto Cubano de Estabilización del Azúcar v. Star Line Shipping Co., 1958 A.M.C. 166 (Arb. N.Y.1957) the arbitrators allowed one per cent as an innage by recognizing that in a bulk cargo of molasses the tanks are normally not completely stripped. The usual loss is one per cent.

 In addition to the actual loss of market value involved, there usually arise necessary expenses incidental to the loss sustained. These include survey fees (to determine the quantum of damage or to render expert assistance in restoration or salvage), necessary transportation, warehousing, and the like. See Continental Distrib. Co. v. Reading Co., 168 F.2d 967 (3rd Cir. 1948). These charges are recoverable if they were reasonably considered necessary at the time they were incurred, although later developments indicate they were not really needed. Illustrative of this type of expense is the cost of a service procured under the mistaken, but reasonable, apprehension that damage was more extensive than it turned out to be. See New Hampshire Ins. Co. v. SS. Castillo Manzanares, 1968 A.M.C. 2317 (D.Del.1967). There are, however, limitations. A recent case from the Fourth Circuit, Swedish Am. Line v. Evans Prods. Co., 431 F.2d 869 (4th Cir. 1970), for example, denied the consignee his survey fees inasmuch as the survey was conducted without notice to the ship.

 Closely akin to the right to recover necessary incidental expenses is the obligation imposed upon the shipper to minimize his own damages. Compagnie de Navigation Fraissinet & Cyprien Fabre, S. A. v. Mondial United Corp., 316 F.2d 163, 1963 A.M.C. 946 (5th Cir. 1963); United States v. The Holland, 164 F.Supp. 741, 1958 A.M.C. 1904 (D. Md.1958); Instituto Cubano de Estabilización del Azúcar v. Star Line Shipping Co., 1958 A.M.C. 166 (Arb. N. Y.1957). The relationship arises out of the fact that the cost of such effort is a recoverable item of damages from an offending carrier. The steps taken

must be reasonable under the circumstances, and, if they go beyond the bounds of ordinary prudence, the carrier is not bound to reimburse the shipper. See Norjac Trading Corp. v. The Mathilda Thorden, 173 F.Supp. 23, 1959 A.M.C. 1831 (E.D.Pa.1959).

■ The rules governing the award of interest to the injured shipper are the same as those that govern litigation generally: it is a matter within the sound discretion of the court. See Gardner v. The Calvert, 253 F.2d 395, 402, 1958 A.M.C. 800, 809–810 (3rd Cir.), cert. den. 356 U.S. 960, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958); Interstate Steel Corp. v. SS. Crystal Gem, 1970 A.M.C. 629, 630 (S.D.N.Y.1970) citing O'Donnell Transp. Co. v. City of New York, 215 F.2d 92, 95, 1954 A.M.C. 1512, 1514 (2nd Cir. 1954). Interest is usually awarded unless the shipper did some act that calls for forfeiture of the right to interest. As O'Donnell Transportation Co. v. City of New York, *supra*, puts it, "allowance of interest is the general rule and . . . disallowance is supportable only in the face of 'exceptional circumstances.'" The award of interest is simply another attempt to make the injured party whole. Miller v. Robertson, 266 U.S. 243, 257–258, 45 S.Ct. 73, 69 L.Ed. 265 (1924).

■ The fact that the shipper had received the proceeds of his cargo insurance and, therefore, was not deprived of his money, does not justify the denial of interest: "The fact that libellant did not lose the use of its damage money is irrelevant. Its underwriter did." Samincorp. v. SS. Rivadeluna, 277 F.Supp. 943, 944–945, 1968 A.M.C. 1062, 1064–1065 (D.Del.1967). Nor does the exaggeration of the claim normally forfeit interest. See Schroeder v. The Montauk, 358 F.2d 485, 488, 1966 A.M.C. 881, 885 (2nd Cir. 1966). On the other hand, dilatory tactics or unexcused delay in prosecuting a claim do justify a denial of all or a part of the interest. New Hampshire Ins. Co. v. SS. Castillo Manzanares, 1968 A.M.C. 2317 (D.Del.1967); The Guanacita, 69 F.Supp. 928, 1947 A.

M.C. 1749 (S.D.Fla.1947). As with the award of interest vel non, the rate is also discretionary. New Hampshire Ins. Co. v. SS. Castillo Manzanares, *supra*; Samincorp. v. SS. Rivadeluna, *supra*; The Guanacita, *supra*.

■ As in most litigated cases, the burden of establishing the quantum of damages rests on the person seeking relief—in this instance the cargo interest. "The primary object in awarding damages is to indemnify plaintiff for the loss sustained by reason of the carrier's fault, and with respect to this issue plaintiff bears the burden of proof." Toho Brussan Kaisha, Ltd. v. American President Lines, Ltd., 265 F.2d 418, 1959 A.M.C. 1114 (2d Cir. 1959); Interstate Steel Corp. v. SS. Crystal Gem, 1970 A.M.C. 617, 627 (S.D.N.Y.1970); O'Brien Bros., Inc. v. The Helen B. Moran, 160 F.2d 502, 1947 A.M.C. 493 (2d Cir. 1947); Weirton Steel Co. v. Isbrandtsen-Moller Co., 126 F.2d 593, 1942 A.M.C. 356 (2d Cir. 1942). But once the quantum of the total loss is established, the burden shifts to the carrier to establish that some portion of the loss was attributable to a peril of the sea for which the carrier would not be liable (Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373 (1934) or to some fault of the shipper himself. See Compagnie de Navigation Fraissinet & Cyprien Fabre, S.A. v. Mondial United Corp., 316 F.2d 163, 1963 A.M.C. 946 (5th Cir. 1963); Empresa Central Mercantil de Representaciones Ltda. v. Republic of the United States of Brazil, 147 F.Supp. 778, 1957 A.M.C. 218 (S.D. N.Y.1957), aff'd 257 F.2d 747, 1958 A. M.C. 1809 (2d Cir. 1958).

To further sustain the point to the effect that the only recoverable damages in a case like the one before the consideration of the court is market value at the port of destination with the adjustments and exceptions already explained herein and to further complement the court's holding that the consequential damages claimed by the plaintiff in this case in his allegation number five contained in the Complaint are not recover-

able under a maritime contract for transportation against a carrier, we will briefly discuss the following cases which have adopted the rule to the effect that consequential damages are not recoverable by the shipper or cargo interest against the carrier, which at the same time confirmed that the only measure of damages is the market value at the port of destination.

In Gluck v. Isbrandtsen Co., 1961 A. M.C. 1549, the Court considered the question of loss of profits arising out of damages for breach of contract of carriage and their loss of merchandise during the carriage. In that particular case, before judgment was entered on behalf of the plaintiff, the consignee of the merchandise, said consignee settled a customer's claim for failure to deliver the goods on time, which failure was occasioned because he, the consignee, was not able to receive the goods in due time from the carrier. At the time of trial, the consignee and the plaintiff tried to recover the cost of said settlement from Isbrandtsen Co., which was the carrier in this case. The Court, considering the question decided that although the consignee's settlement of a customer claim for failure to deliver the goods on time would be considered fair and reasonable as between them, the amount of such settlement was not recoverable from the ocean carrier responsible for the delay, since the carrier was not chargeable under the contract of carriage with notice of the consignee's contract with its customer, and further since the settlement amount took in consideration the latter's loss of profit.

In Texas Instruments, Inc. v. Branch Motor Express Co., 308 F.Supp. 1228 (D.Mass.1970), it was held that the consignee of a tape-controlled drill machine which arrived in damaged condition was not entitled to special damages because it took six weeks before another machine could be obtained from the manufacturer, which allegedly cost the consignee labor wages which would not have been necessary if the machine had operated properly. Furthermore, an alleged loss of profits, if any, was essentially speculative, depending more on optimistic opinions and assumptions than on solid facts.

In Meltzer v. Baltimore & O. R. Co., 38 F.Supp. 391 (EDPa.1941), it was held that a consignee suing the carrier to recover damages for injuries to certain carloads of water melons was not entitled to have added to ordinary damages some amount representing the part of his money loss arising from the disorderly condition of some of the loads, where there was no proof that his whole money loss over and above the difference between undamaged and damaged value of melons was due to that factor. Also in Baltimore & O. C. Terminal R. Co. v. Becker Milling Machine Co., 272 F. 933 (7th Cir. 1921), the Court of Appeals for the Seventh Circuit held that where a manufacturer of a particular type of machinery, being unable to supply the demand, engaged another company to fabricate 200 of the machines, furnishing special prints, patterns, tools, etc. and its own mechanical engineer to inspect the materials and workmanship, the amount paid to such company for each machine was not the measure of recovery against a carrier which destroyed two of the machines. Since in that case there was no market place or public exchange in which by competitive offers and bids any market price of a special type of machine could be determined, the Court understood that the amount purchasers were willing to pay was evidence of the sales value in the action against the carrier for the destruction of the two machines.

British Law relating to carriage of goods by sea is similar to Federal Maritime Law in this respect pertaining to damages. In the leading case of Hadley v. Baxendale, L. J. Ex., 179–183; 9 Ex. Ch. 341 (1854) carriers had been unreasonably slow in delivering a broken mill shaft which had been sent to an engineer as a model for a new one. In consequence of this delay, the making of the new one was delayed and the mill was stopped for the want of it. It was

1320

held that the carriers were not liable for the loss of profits due to the lengthened stoppage at the mill. Such loss would neither have flowed naturally from the breach of the contract nor were the special circumstances, which perhaps would have made it a reasonable and natural consequence of such breach of contract, communicated to or known by the defendant.

In Gee v. Lancs. & Yorks Ry., 30 L.J. Ex. Ch. 11; 6 H. & N. 211 (1860) where there had been delay in delivering some cotton to a mill owner, by reason of which his mill stood idle for a time, it was held to be an erroneous instruction to tell the jury that he was entitled to claim the wages he had paid and the proceeds he would have made during that time. The Court said at 30 L.J. Ex. 15:

"It was not the consequence of the non-arrival of the cotton alone, but it was the consequence of the non-arrival of the cotton and of the plaintiff's having no cotton to resort to. No doubt, if it could be made out that the practice in the neighborhood of Liverpool and Manchester was such that every carrier must know that when cotton was sent there was a mill standing still until it should arrive, all this would have been a right direction (referring to the instruction to the jury). If they had notice of that, either actual notice or if from the course of business they could have anticipated it, the damages would have been perfectly right."

In British Columbia Saw Mill Co. v. Nettleship, L. R. 3 C.P. 499 (1868), the plaintiffs had delivered several cases of machinery to the defendant's servants on a quay (dock) at Glasgow, for shipment to Vancouver Island on board the defendant's vessel which lay alongside. The Master knew at the time that these cases contained different portions of machinery, which were intended for a sawing mill to be erected and used by the plaintiffs in British Columbia. On the vessel's arrival one of the cases was missing and consequently the mill could

not be erected. The plaintiffs were obliged to send to England to replace the lost parts, and thus great delay and loss of profitable business ensued. Compensation for the whole loss sustained was claimed, but it was held that the plaintiffs could only recover the cost of replacing the lost parts, including freight, to Vancouver Island, with interest at 5% upon the amount, by way of compensation for the delay. It was considered that the Master could not be supposed to know that the whole machinery would be useless without the parts that were lost, or that those parts could only be replaced in England.

III.

Undoubtedly, there must exist in the mind of all concerned in this case the doubt as to whether in any type of situation consequential damages can be awarded under a breach of a maritime contract for transportation.

The first example of consequential damages in this type of contract is illustrated by the case of L. E. Whitlock Truck Service, Inc. v. Regal Drilling Co., 333 F.2d 488 (10th Cir. 1964). The Whitlock case involved an action to recover damages to an oil well drilling rig incurred while it was being transported by a common carrier. In that case, an award of special damages was opposed because it was proved to the court that the carrier specialized and was experienced in the hauling of oil-well equipment and was fully aware of the importance of time to those engaged in the drilling business. Furthermore, the carrier knew, and evidence was brought in this respect before the Court, that the cargo interest had only the one drilling rig; thus the appellant knew the circumstances upon which special damages awarded were based. This case by its own facts is one of the exceptions to the general rule which we have fully explained in this Memorandum Order and obviously and without any necessity of further exposing facts in relation to the same, is completely different from the case at bar.

Another situation which the courts have considered as permitting the award of special damages pursuant to a maritime contract for transportation are cases in which a carrier has illegally denied shipping space to cargo interests in violation of the provisions contained in the United States Shipping Act, 46 USCA 801 et seq. The Shipping Act, by the terms of its provisions, permits that when illegal denial of space represents a real loss, expected profits lost by the shipper because of the legal act of the carrier are compensable by reparations under the Shipping Act. See to this effect Consolo v. Federal Maritime Commission et al, 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). Other than in the circumstances outlined herein and similar ones that would justify our departing from the general rule we adopt today, the Court understands that the measure of damages would be market value at the port of destination as contemplated in allegation number 6 of the Complaint filed herein and that, of course, the consequential damages contemplated in allegation number 5 are not recoverable as a matter of law and for that reason the defendant is entitled to a partial judgment on the pleadings dismissing the Complaint filed herein as to allegation number 5.

Be it remembered that this decision shall not be construed as departing from the abundant case law decided by the United States Court of Appeals for the First Circuit dealing with maritime matters which involve the Commonwealth of Puerto Rico pursuant to Sections 7 and 8 of the Federal Relations Act, 1 LPRA 7 and 8. See also 48 U.S.C. 747 and 749. Pursuant to the aforementioned Federal Relations Act the Commonwealth of Puerto Rico has been recognized the right to depart from the uniformity rule in maritime law contemplated in this decision, specially in the cases involving maritime personal injuries. See Lastra v. N. Y. & P. R. SS. Co., 2 F.2d 812 (1st Cir. 1924); Guerrido v. Alcoa SS. Co., 234 F.2d 349 (1st Cir. 1956); Fonseca v. Prann, 282 F.2d 153 (1st Cir. 1960); Waterman SS. Co. v. Rodriguez, 290 F.2d 175 (1st Cir. 1961); Alcoa v. Vélez, 376 F.2d 521 (1st Cir. 1967); Alcoa v. Pérez, 376 F.2d 35 (1st Cir. 1967); Alcoa v. Pérez, 424 F.2d 433 (1st Cir. 1970); Compañia Trasatlántica Española v. Meléndez Torres, 358 F.2d 209 (1st Cir. 1966); Feliciano v. Compañia Trasatlántica Española, 411 F.2d 976 (1st Cir. 1969); Ramos v. Beauregard, Inc., 423 F.2d 916 (1st Cir. 1970); Colón Núñez v. Horn-Linie et al., 423 F.2d 952 (1st Cir. 1970).

It is so ordered.