**CARGILL, INCORPORATED**

v.

**S/S NASUGBU, her engines, tackle, apparel, etc., in rem, and Nasugbu Navigation Co., Inc., and California Molasses Company, in personam.**

Civ. A. No. 73-274.

United States District Court,
M. D. Louisiana.

Dec. 3, 1975.

**344**

Charles Kohlmeyer, Jr., Thomas W. Thorne, Jr., Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, La., for plaintiff.

Charles E. Dunbar, III, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for defendants.

E. GORDON WEST, District Judge:

This maritime libel is brought by libelant Cargill, Inc. (Cargill) against respondents Nasugbu Navigation Co., Inc. (Nasugbu) and California Molasses Co. *in personam,* and against the S/S NASUGBU *in rem* seeking damages for contamination of a cargo of molasses owned by Cargill. Cargill was the consignee of a cargo of blackstrap molasses shipped to Port Allen, Louisiana, from Puerto Cortez, Honduras, and Vera Cruz, Mexico, aboard the S/S NASUGBU pursuant to a molasses charter party entered into on July 3, 1973, between Cargill Americas, S.A., the original cargo owner, and Nasugbu, the vessel owner. Prior to NASUGBU's arrival in port, Cargill became the owner of the cargo. Upon the NASUGBU's arrival in Port Allen, Louisiana, on September 1, 1973, the molasses, stored in twelve separate storage tanks, was found to be contaminated with creosote in varying degrees. Cargill refused to accept delivery of any part of the cargo, and retained a marine cargo surveying firm to sell the molasses as a salvage distress lot. Sealed bids were solicited and the entire cargo, roughly 8,825 short tons, was sold to the high bidder. Cargill seeks to recover the difference between what the molasses would have been worth but for the contamination, and the value received upon its bidded disposition.

Nasugbu defends on the ground that Cargill was unreasonable in refusing to accept delivery of the molasses and counterclaims for demurrage resulting from the delay in discharging the vessel and for ten per cent (10%) unpaid ballance of the ocean freight. Cargill concedes that the unpaid freight balance is due and owing.

California Molasses Co., a foreign corporation, has filed no responsive pleadings in this matter, but no default was ever requested or entered against this respondent.

Prior to trial, Nasugbu admitted that the NASUGBU was unseaworthy at the inception of this voyage due to the presence of creosote residual in its pumps and cargo lines, and that such condition was discoverable by Nasugbu in the exercise of due diligence. Nasugbu further admitted that the molasses contamination resulted from its pumping through the NASGUBU's pumps and cargo lines which contained the creosote residual, and that the occurrence was the fault of Nasugbu's servants, in violation of the charter party.

Liability for contamination of the cargo being admitted, the only questions remaining before the Court are: (1) whether any damages were in fact sustained by Cargill, and if so, the extent and measure thereof, and (2) whether Cargill is liable to Nasugbu for demurrage because of its unconditional refusal to accept delivery of the cargo.

This case was tried to the Court without a jury on June 2, 1975, and now, after due consideration of the evidence and arguments of counsel, the Court concludes that Cargill did sustain damages as a result of the cargo contamination and is entitled to judgment in its favor. The Court further concludes that respondent Nasugbu is not entitled to limitation of liability to the extent of its ownership interest in the vessel.

However, Cargill was unreasonable in refusing to accept delivery of this contaminated cargo, and is liable to Nasugbu for resulting demurrage, in addition to the unpaid freight. The Court therefore makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### 1.

Libelant Cargill produces a high quality livestock feed reputably known in the industry as "Nutrena." A component of Nutrena is blackstrap molasses which goes into the production of liquid and dry based feed supplement by Cargill's Nutrena Feed Division that in turn comprises part of the final product. Cargill meets most of its molasses requirements by importing from South and Central America into U. S. Gulf ports. It then ships the cargo via barges up the Mississippi River to its various feed supplement production plants in the upper Missouri River Valley. Cargill owns and/or leases storage terminal facilities at various points along the Mississippi and Missouri Rivers, and must get its up-river terminals to full capacity before the Missouri River freezes over in November so that the Nutrena Feed Division can produce feed supplement through the winter months.

### 2.

On July 3, 1973, Cargill Americas, S. A., entered into a molasses charter party with Nasugbu requiring the NASUGBU to transport specified tonnages of blackstrap molasses from Central American ports to U. S. Gulf ports as designated on bills of lading. This charter party provided, *inter alia*, that the charterer (or its consignee) would be liable for demurrage at the rate of $1,400.00 per day for any time exceeding the allowable sixty hours lay time when discharging the vessel's cargo. It also provided that Nasugbu would not be responsible for cargo contamination unless such contamination resulted from an unseaworthy condition of the vessel existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence. The charter party further stipulated that Nasugbu would have the benefit of all limitations of, and exemptions from, liability accorded them as vessel owner by any statute or rule of law then in force.

### 3.

Nasugbu negligently cleaned the NASUGBU's pumps and cargo lines following discharge of a cargo of creosote on or about August 21, 1973.

### 4.

The NASUGBU was unseaworthy at the inception of this voyage at Puerto Cortez, Honduras, on or about August 24, 1973, and was unfit to carry the molasses cargo because of the presence of a residual of creosote in some of the NASUGBU's pumps and lines. Such condition was discoverable by Nasugbu in the exercise of due diligence.

### 5.

Contamination of the molasses occurred as a result of pumping it through the NASUGBU's pumps and cargo lines which contained the creosote residual, due to the fault of Nasugbu's servants in violation of the charter party.

### 6.

Cargill became the owner of the molasses prior to the NASUGBU's arrival in port.

### 7.

The NASUGBU docked in Port Allen, Louisiana, on September 1, 1973, laden with this shipment of molasses taken aboard in Puerto Cortez, Honduras, and Vera Cruz, Mexico, which originally had been consigned to Cargill. The molasses was stored in twelve separate storage tanks. A "notice of readiness" to discharge the cargo was issued at 18.30 hours by the vessel's master to Henry Gravois of Cargill's Molasses Department.

## 8.

That evening, Gravois went aboard the NASUGBU accompanied by an agent for the vessel, a U. S. Customs Agent, LeJeune, a Cargill representative, and Derek Waugh, a surveyor from Evans Laboratories in New Orleans, Louisiana, in order to survey the cargo for quantity and quality. Sampling and gauging were proceeding when LeJeune indicated to Gravois that there appeared to be a foreign substance in the molasses. Gravois conducted his own subjective observations by tasting and smelling the molasses in several of the storage tanks. The foreign substance was creosote.

## 9.

Gravois notified Jerry Grund, Cargill's Operation Manager in Minneapolis, Minnesota, and Cargill's cargo insurer, Insurance Company of North America (INA), about the situation. Gravois then delivered a letter to the vessel's master advising that Cargill believed the cargo to be contaminated with creosote and that Cargill would hold the NASUGBU responsible for all resulting damages and costs.

## 10.

The next morning, September 2, 1973, one composite and seven individual samples were taken from the Puerto Cortez shipment for analysis by Cargill and its cargo surveyors. One composite and five individual samples were also taken from the Vera Cruz shipment. The following Tuesday, September 4, 1973, cargo samples were taken for analysis by the vessel's interests. Sampling was conducted by means of a "bomb sampler," a round cylindrical device which is dropped into the molasses with a chain through the tank hatch. When the bomb sampler reaches the desired level, another chain is pulled to open a door to allow the sampler to fill with molasses.

## 11.

Gravois next contacted Manard Molasses Co. in Port Allen, Louisiana, to inquire whether they would store the molasses in their terminal facility. Manard reluctantly agreed to accept the molasses, but at Cargill's risk if any contamination to their storage tanks resulted. Gravois also contacted Pacific Molasses Co. in New Orleans who agreed to accept the molasses for storage under the same restrictive conditions, i. e., at Cargill's risk. Cargill rejected the idea, and made no serious attempt to locate barges or railroad tank cars for storage of the molasses for fear of potential liability should contamination of such temporary storage facilities result.

## 12.

Under the relevant provisions of the charter party, lay time expired and demurrage began at 12.30 hours on September 4, 1973.

## 13.

Cargill's samples were analyzed by Analysis Laboratories in New Orleans on September 10, 1973. The gas liquid chromotographic analysis revealed that the individual tank samples of the Puerto Cortez shipment were contaminated with creosote in degrees ranging from 22 parts per million (p. p. m.) to 136 p. p. m. The Puerto Cortez composite sample was found contaminated to the extent of 82 p. p. m. Four of the Vera Cruz individual samples showed no discernible contamination, less than 4 p. p. m., while the fifth sample tested 8 p. p. m. of creosote. The composite Vera Cruz sample, though, revealed contamination to the extent of 12 p. p. m., suggesting that the individual Vera Cruz samples may not have reflected "pockets" of creosote present in those tanks.

## 14.

Individual cargo samples were also analyzed by the staff of Cargill's Molasses and Related Products Group under the supervision of Dr. James Mickus. They subjectively tested the samples by taste and smell and unanimously concluded that five of the twelve samples

were contaminated. Robert Morrissette of Cargill's Instrumental Analysis Group conducted chromotographic and ultraviolet analyses which revealed six of the twelve samples to be contaminated. Based upon the results of the subjective and instrumental testing, Mickus' department recommended total rejection of the cargo for two principal reasons: (1) fear of contaminating molasses inventories in Cargill's up-river terminals because of their inability to segregate this shipment, and (2) the questionable palatability of livestock feed containing creosote.

### 15.

After due consideration of the various test results and the potential risks involved, Douglas Linder, manager of Cargill's Molasses Department, Jerry Grund, Cargill's Operation Manager, Dr. Mickus, and Henry Gravois unanimously concluded that rejection of the total shipment of molasses was in order. Their collective judgment was that, in addition to the other factors previously alluded to, utilization of this damaged cargo would risk harm to the Nutrena Feed Division's merchandising program if problems should develop with ultimate users of the feed supplement. Being a highly toxic, phenolic compound, creosote is capable of inducing gastroenteritis in cattle consuming contaminated livestock feed over an extended period of time where present in such miniscule amounts as 2–3 p. p. m.

### 16.

Cargill's decision to reject was also predicated upon their fear that there might be more creosote in the molasses than had been revealed by their sampling procedures.

### 17.

■ Cargill's insurer, INA, retained the marine cargo surveying firm of Albert R. Lee & Co., Inc. to dispose of the molasses as a cargo distress lot. A bid solicitation letter was drafted by Harry Towe, Albert R. Lee and Co.'s Vice-President, and mailed on Cargill's behalf to potential bidders on September 18, 1973. Bids were invited on an "as is, where is" basis. The wording of the bid solicitation was approved by John Sims, attorney for Nasugbu. Although disputed, this method of disposing of large quantities of damaged cargo is not uncommon, especially when litigation is anticipated. The Court finds that the disposal of this cargo through solicitation of sealed bids was reasonable and proper.

### 18.

Bids were opened on September 26, 1973, at INA's office in New Orleans, and only two bids were received. That of the higher bidder, Morrison Grain Company, at $31.25 per short ton, was deemed acceptable by Messrs. Sims and Dunbar, attorneys for Nasugbu. Even the vessel's undertakers, Salvage Association, London, stated in their general report that they considered the Morrison Grain Co. offer to be "very satisfactory in view of the condition of the molasses."

### 19.

■ On or about September 28, 1973, Morrison Grain Co. paid Cargill $275,-770.03 for the entire shipment of contaminated molasses. Even though the entire cargo was resold by Morrison Grain Co. just two days later to Consolidated Milling Co. "as is, where is" for $317,687.08, the Court finds that the price received by Cargill was reasonable. This finding is supported by the Salvage Association, London report, and by the response of Donald G. Westerbeke, owner of Consolidated Milling Co., to the following question propounded during the taking of his deposition:

Q: "How much did you pay Morrison Grain Co.?"

A: "I paid Morrison Grain Co. *too much:* $36 per ton." (Emphasis added.)

### 20.

The NASUGBU eventually discharged the molasses at 5.35 hours on October 1,

1973, at the Louisa Street Wharf terminal of Pacific Molasses Co. in New Orleans, Louisiana. This was twenty-six days, seventeen hours and five minutes after lay time expired under the charter party.

21.

Cargill incurred survey and sampling costs totalling $4,206.18 in connection with the disposition of this cargo, and paid Marshal's costs of $947.05 incurred as a result of the vessel's seizure.

22.

The parties have stipulated and the Court finds that the fair market value of this cargo *in sound condition* upon its arrival in Port Allen, Louisiana, would have been $532,302.40.

23.

■ The parties have stipulated and the Court further finds that Cargill owes Nasugbu the ten per cent (10%) unpaid balance due on freight charges.

24.

Nasugbu has filed a release bond with this Court in the amount of $225,-000.00, representing its interest in the vessel. The parties stipulated at trial and the Court finds that this amount represents the fair market value of the NASUGBU which had been seized pursuant to warrant issued on September 7, 1973.

## CONCLUSIONS OF LAW

1.

■ This libel for damages arising from a breach of a molasses charter party and the counterclaim for demurrage arising therefrom lie within our admiralty jurisdiction. *Morewood v. Enequist*, 64 U.S. 491, 23 How. 491, 16 L.Ed. 516 (1860); *Moore's Federal Practice*, Vol. 7A, p. 2901; 28 U.S.C. § 1333.

2.

Nasugbu's liability for the cargo contamination was stipulated pursuant to the relevant provisions of the charter party which also incorporated §§ 3(1) and 4(1) of the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. §§ 1303(1), 1304(1).

3.

■ Respondent Nasugbu in its answer pleaded limitation of liability as vessel owner under the provisions of the Shipowners' Limited Liability Act, 46 U.S.C. § 181 et seq. Section 183(a) of that statute provides in part that:

"The liability of the owner of any vessel, whether American or foreign, for any . . . loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel . . . occasioned, or incurred, without the privity or knowledge of such owner . . shall not . . . exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

A vessel owner is charged with "privity or knowledge" when "he has failed in his duty of 'due diligence' and has sent out a ship unseaworthy in some respect that proximately contributes to the loss." Gilmore & Black, *The Law of Admiralty* (2nd Ed. 1975), § 10–20, pp. 877–878. Since Nasugbu admitted that its vessel was unseaworthy at the time this cargo was loaded because of the presence of creosote in the vessel's pumps and lines, and that such condition caused the cargo contamination and was discoverable by Nasugbu "in the exercise of due diligence," they are chargeable with "privity or knowledge" under the Act, and are not entitled to liability limitation. Id., § 10–24, p. 884.

4.

Since we have found that Cargill's method of disposing of the damaged cargo was reasonable, and that the price received for that cargo was reasonable, the Court concludes as a matter of law that Nasugbu has failed to satisfy its burden of proof that Cargill failed to mitigate its damages. 5 *Corbin on*

*Contracts*, § 1089 (1964); *Restatement of Contracts*, § 336(1).

## 5.

Accordingly, Cargill is entitled to compensatory damages of $256,532.37, which is the difference between the stipulated fair market value of the molasses in sound condition upon date of arrival in port, and the price received for the contaminated cargo from Morrison Grain Co., *Santiago v. Sea-Land Service, Inc.*, 366 F.Supp. 1309 (D.Puerto Rico 1973); *Emmco Insurance Co. v. Wallenius Caribbean Line, S.A.*, 492 F.2d 508 (CA 5—1974).

## 6.

Cargill is also entitled to recover the sampling and survey fees, and Marshal's costs incurred, totalling $5,153.23. *Santiago v. Sea-Land Service, Inc.*, supra.

## 7.

The Court further concludes that Cargill is entitled to prejudgment interest on its total damages at the rate of seven per cent (7%) from date of judicial demand, since interest "is usually awarded unless the shipper did some act that calls for forfeiture of the right to interest." Id. at 1318; *Brown v. Aggie & Millie, Inc.*, 485 F.2d 1293 (CA 5—1973); *Chagois v. Lykes Bros. Steamship Co.*, 432 F.2d 388 (CA 5—1970).

## 8.

Arrival of the cargo in a damaged but not totally useless condition did not relieve the consignee of its obligation to take delivery of the cargo as required by the terms and conditions of the charter party. *Compagnia Di Navigazione Mauritius Rome v. Kulukundis*, 182 F.Supp. 258 (E.D.N.Y.1959). As stated in Miller, *Law of Freight Loss and Damage Claims*, at § 506.1 (1st Ed. 1953):

> "The duty of the consignee of goods transported by a carrier to accept delivery thereof is not ordinarily excused by the fact that the goods are damaged, unless such damage renders the property practically valueless, having regard to the expense of acceptance and use, and to the purpose for which it was intended."

This molasses certainly was not valueless, as reflected by the sizeable sum brought upon its sale.

## 9.

We must distinguish Cargill's claim for damages resulting from cargo contamination from Nasugbu's counterclaim for demurrage, or delay damages, resulting from Cargill's refusal to accept delivery. As stated by the court in *Pennsylvania R. R. Co. v. Moore-McCormack Lines, Inc.*, 370 F.2d 430, at 432 (CA 2—1966):

> "The general rule is that demurrage is extended freight and, where there has been an excess of lay days over those stipulated, the consignee is liable to pay demurrage for those excess days regardless of what brought about the delay except (1) where a specific provision of a charter party exonerates the consignee from liability for demurrage; (2) where the delay is the fault of the carrier or those for whom he is responsible; or (3) where the delay is caused by a vis major."

See also, *Houston Belt and Terminal R. Co. v. Connell Rice & Sugar Co.*, 411 F.2d 1220 (CA 5—1969); *Port Terminal R. R. Ass'n v. Connell Rice & Sugar Co.*, 387 F.2d 355 (CA 5—1967); Gilmore and Black, *The Law of Admiralty*, § 4–8, p. 213. The fact that Cargill would have been required to store the molasses in available terminal facilities at its risk in the event of contamination of such facilities is of no moment, since the charter party provided for demurrage when discharge of the cargo exceeded the allowable lay time of sixty hours. This obligation was not relieved by any other provision of the charter party. The *delay* in discharging the cargo can-

not be said to have been Nasugbu's fault just because the cargo *damage* resulted from the vessel's unseaworthiness.

10.

Nasugbu is entitled to recover demurrage from Cargill computed from 12.30 hours on September 4, 1973, when lay time expired, to 5.35 hours on October 1, 1973, when NASUGBU discharged at the Pacific Molasses Co. terminal in New Orleans. This amounts to $37,396.-47, arrived at by multiplying 26 days, 17.05 hours by $1,400.00 per day, or $58.33 per hour. *Pennsylvania R. R. Co. v. Moore-McCormack Lines, Inc.,* supra.

11.

Nasugbu is also entitled to recover the unpaid freight charge balance which the Court fixes at $4,925.00. *Compagnia Di Navigazione Mauritius Rome v. Kulukundis,* supra.

12.

 Service of process was effectuated upon respondent California Molasses Co. in violation of the express provisions of La.R.S. 13:3471 in that no order of this Court ever issued permitting service to be made upon California Molasses Co. through the Secretary of State. *White Factors, Inc. v. F & B Supplies, Inc.,* 211 So.2d 754 (La.App. 4th Cir. 1968); *Stelly v. Quick Mfg. Inc.,* 228 So.2d 548 (La.App. 3rd Cir. 1969); FRCP 4(d). However, while the defenses of insufficiency of service of process and lack of jurisdiction over the person were waived under FRCP 12(h)(1)(B) by this respondent's failure to file any motions or responsive pleadings, Wright & Miller, *Federal Practice and Procedure,* § 1391, no default was ever taken against this defendant nor was there any evidence produced upon which a judgment against this defendant could be based.

13.

For there reasons, judgment will be entered in favor of libelant Cargill, Inc.

for $219,364.13, which is the total of its compensatory and special damages set-off by demurrage and freight to which respondent Nasugbu is entitled, together with interest at the legal rate thereon from date of judicial demand until paid. Because of the breach of the respective duties owed by libelant Cargill and respondent Nasugbu under the charter party, each side shall bear its own costs and attorneys fees. No preliminary judgment of default having been requested or entered against California Molasses Co., and no evidence having been presented against this respondent at trial, judgment will be entered in favor of California Molasses Co. under FRCP 41(b) dismissing this suit in its entirety as to this respondent.