JAKO MARKETING CORP., Plaintiff,

v.

M.V. SEA FAN, her engines, boilers, etc., Sea Fan Transport, Inc., M.V. Woko Maru, her engines, boilers, etc., Zuito Kaiun K.K., M.V. Sea Bells, her engines, boilers, etc., Sea Bells Transport, Inc., Sanko Steamship Co., Ltd. and Lavino Shipping Company, Defendants and Third-Party Plaintiffs,

v.

LAVINO SHIPPING COMPANY and Atlantic and Gulf Stevedores, Inc., Third-Party Defendants.

No. 80 Civ. 3992(MP).

United States District Court, S.D. New York.

Feb. 24, 1983.

Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy by John Eric Olson, New York City, for plaintiff.

Walker & Corsa by Christopher H. Mansuy and Henry F. Billingsley, II, New York City, for defendants.

McHugh, Leonard & O'Conor by John P. Conroy, New York City, for third-party defendants.

## OPINION

MILTON POLLACK, District Judge.

This is an admiralty suit tried to the court at a Bench trial. Jurisdiction exists under 28 U.S.C. § 1333. For the reasons appearing hereafter, plaintiff is entitled to a recovery from the defendant Sanko Steamship Co., Ltd.

Jako was an importer of tires from Korea transported to the United States in bulk through Sanko ships up to the fall of 1979. Jako sues for its losses and expenses incurred as a result of damage and deformation to the cargoes of truck tires which it imported from Korea and destined for East and Gulf Coast ports. The tires were carried in the lower holds of the M/V SEA BELLS, SEA FAN and WOKO MARU. The defendant Sanko was the time charterer of the three vessels and acted as a common carrier for hire. Sanko issued "clean," received for shipment, bills of lading at Inchon and Busan, Korea, the ports of loading. Jako was the consignee of the cargoes and was the holder in due course of the bills of lading.

The defendants, Lavino Shipping Company and Atlantic and Gulf Stevedores, Inc. acted as stevedores at Camden and Houston, respectively.

A substantial portion of the truck tires arrived at their respective destinations in damaged and deformed condition. This was noted in all survey reports and observed by representatives of the parties at some of the ports, and Sanko was informed that Jako had received deformed and damaged tires.

The deformation was in the side wall or in the tread area and the damaged tires had a severe distortion of the bead (which is the inner molding or rim of the tire). A survey was jointly made by Jako, representatives of the insurance company, and representatives from the steamship company. Personnel from Smithers Scientific Services, Inc. were instructed to sort out and segregate the tires into three categories, viz., first-class quality, deformed tires, and damaged tires, which was done. Thus, the tires were grouped into the category of (1) tires which had kinked or deformed beads; (2) tires which were visually misshapen, with misaligned beads or distorted side walls; and (3) tires which had arrived in commercially acceptable condition.

The decision was made to destroy the damaged tires because the bead thereon was kinked or distorted and rendered such tires unsafe for mounting on wheels—a kinked bead is irreversible; it cannot be straightened. Every tire that was classified as damaged was related to a bead area problem, not a side wall problem.

It was decided that the tires classified as deformed should be sold as "blems" (meaning below top quality) at a reduced price because from their appearance no customer would pay the regular price structure for a tire that had a severe deformation, and those tires were offered and sold that way.

The plaintiff contended that the deformation and damages were caused either by improper methods of stowage and securing of the tires in the holds on board the three ships involved or by improper methods of discharging and handling of the tire cargo by the stevedores who were acting on behalf of Sanko, the charterer, at destination ports. However, no evidence established fault on the part of the stevedores, and they were dismissed from the suit at the close of the evidence. The claims against the three ships were also dismissed at the close of the trial as the ships were not properly served *in rem*.

The proof did establish by a fair preponderance of the credible evidence that the stowage of the cargo was improper and negligent and that this was the proximate cause of the damage and distortion to the spoiled tires. The damage and deformation were caused by the way the tires were stowed on the vessels and not due to any defect in their construction or change in their specifications or in the manner in which the bundles of tires (five to a bundle) were banded together when taken aboard.

The evidence established that an uninflated tire will not stand excessive weight put on it in stowing it; it will compress and become deformed from being subjected to excessive weight. With passage of time and weight load on a tire, a permanent deformation or damage will occur. Consequently, in loading and stowing tires on a vessel, it is requisite that the tire stacks or bundles be loaded on top of one another in an even fashion—a structured loading. In a perfectly structured stowage pattern, a uniform deformation will occur all around the tire. Uniform deformation does not create any problem in marketing tires because its effects are only temporary. Consequently, to avoid unacceptable deforma-tion or damage, the load on tires stowed must be placed on the center of the tread. Then, if a side wall bulges, it will bulge symmetrically on both sides; there will be a flattening effect. However, if the loading is made so that the overhead force is on the edge of the tread, a non-uniform deformation will occur—a wobbling effect—and given time in that position, the underneath tires will become irretrievably distorted or the beads damaged and commercially unacceptable as first quality or as safe for mounting.

The truck tires were bundled and metal strapped in groups of five to keep them in an upright position rather than have them slant. The damaged and distorted tires were those stowed on the bottom of the loads. The bundles were stored on the tread (standing up) with the eyes (openings) of the bundles running fore and aft and each tier of bundles was nestled into the spaces between the tops of the bundles of the tires below.

Thus, the overweight, which will be described shortly—the weight of the tires in the top tiers—was so heavy that it had a crushing effect on the bundles below—on the edge of the treads below—causing distortion and kinking of the tires below. This was a fairly known consequence, reasonably to be apprehended by anyone involved in stowing tires in the hold of a ship—not good practice and conducive to distortion and damage. Photographs of the stow and testimony as to the stowage procedure and evidence concerning the manner in which the type of damage and deformation resulted credibly establish an improper stow.

The loading surveyors, Korean Adjusters and Surveyors Corp., acting at the request of Sanko, surveyed the loading of the three vessels, the M/V SEA BELLS, SEA FAN, and WOKO MARU, at Inchon and reported that an inspection was made of every package and noted exceptions for 270 tires "wet by rain," consigned to Houston on the M/V WOKO MARU. No other exceptions were noted. Their survey reports stated: "During the entire course of loading operation, inspection was made of every package and

found each and all in good order and condition with the exceptions as follows." Those exceptions referred to the tires noted to be "wet by rain."

The tires ranged in size from 50 to 120 pounds and were loaded on board in bundles of five tires of the same type in each bundle. The tires were stowed from the bottom of the hold up, on their treads. There was no separation or platforms between the tiers of tires, nor was there any other type of dunnage utilized in the hold. The tires were stowed across the holds up to the vertical frames on both sides of the ships.

In addition to the cargo loaded at Inchon, 1,537 bundles of tires, weighing 345 metric tons, were loaded at Busan, Korea, on top of the tires taken on at Inchon. The claims herein by the plaintiff relate only to the tires that were at the bottom of the stow in each vessel.

The photographs produced at the trial and the testimony indicated that stowing had been on a random basis; the cargo was not stowed in a uniform manner. Void spaces existed between the bundles, some bundles were with one end higher or lower than the other, and some of the tiers of the stow overlapped to some degree. In one instance, a bundle was stowed perpendicular to the others. The tires were not stowed by size, and the bundles were mixed.

## M/V SEA BELLS

Eight hundred and one bundles of tires, weighing 196.5 metric tons, were loaded in the hold of the M/V SEA BELLS for discharge at the ship's final destination port, Camden, New Jersey. The Camden tires were stowed in tiers one through six. Stowed above the Camden tires, in tiers five through ten, fore and aft and side to side, were 1,176 bundles of five tires each, with a total weight of 286.9 metric tons destined for Jacksonville, Florida. Stowed on top of those tires were 592 bundles of tires in tiers ten through thirteen, with a weight of 143.6 metric tons, destined for Houston. The SEA BELLS discharged the tires respectively at Houston, then Jacksonville, and finally at Camden. Plaintiff makes a claim only with respect to the Camden discharge.

## M/V WOKO MARU

The WOKO MARU was loaded at the port of Inchon, Korea. Eight hundred seventy-one bundles of five tires, weighing approximately 214 metric tons, were consigned to Jako at the port of Houston. These were loaded into Hold Number One and were stowed in the aft portion of the hatch in the first through seventh tiers. Above the Houston tires from fore to aft and side to side, 1,151 bundles of five tires each were stowed on top of the Houston tires for discharge at Camden. These tires weighed 278 metric tons and were stowed in tiers six through eleven. Stowed on top of the Camden tires in tiers eleven through thirteen were 446 bundles of tires weighing 104 metric tons for the first port of discharge for the vessel at Jacksonville, Florida.

The M/V WOKO MARU first discharged tires from its Number One Hold at Jacksonville, Florida, and then proceeded to Camden and discharged tires from the same hold there. Finally, it proceeded to Houston, and the remaining tires were discharged. No claim is made by the plaintiff with respect to the tires discharged at Jacksonville.

## M/V SEA FAN

The M/V SEA FAN loaded 785 bundles of five tires each at the port of Inchon, Korea, each weighing 173 metric tons, consigned to the port of Camden. These tires were carried in tiers one and two of Hold Number One. On top of that stow, there were loaded at the port of Busan, Korea, 1,537 bundles of tires weighing 345 metric tons, consigned to Jacksonville, Florida. In the aftermost part of Hatch Number Two, 840 bundles of five tires consigned to Houston and weighing 185 metric tons, ex Inchon, were located. The M/V SEA FAN first discharged tires from Number One Hold at Houston and Jacksonville and then proceeded to Camden, where the bottom stowed tires were discharged. The surveyor acting at the request of Sanko noted near the completion of discharge that a

number of tires were somewhat misshapen. Plaintiff makes no claim for the tires discharged at Houston or Jacksonville.

The surveyors acting at the request of Sanko reported that all three ships reported encountering at least force nine winds during their voyages to the United States and that the log books for the M/V SEA FAN and SEA BELLS referred to "rolling and pounding."

Mr. David Williams of Smithers Scientific Services, Inc., who was retained by the ship owners' P & I Club to sort and inspect the tires, stated in his final report letter that the main cause of badly deformed side walls and kinking in the majority of tires is due to both handling in and out of the ship, as well as the method of stowage in the ships' holds.

In sum, the plaintiff amply established liability of the defendant Sanko for the harm caused to the tires. The evidence preponderantly demonstrates that the manner of stowage was not customary or proper, was not undertaken in a reasonable or workmanlike manner, and was not in accord with acceptable stevedoring practices.

The stowage of the tires up to thirteen tiers clearly reflects a disregard on the part of Sanko for the safety of the cargo. The defendant was aware that subjecting the lowermost tires to such extreme weights when stowed in random fashion could result in compression damage to the tires and the defendant nonetheless stored the tires in this fashion. The defendant's negligence caused the damage and distortion of the plaintiff's tires.

*Damages*

Plaintiff claims damages for deformed tires that were sold for salvage, for damaged tires that were destroyed, and for expenses incurred in the sale and destruction of these tires. Plaintiff also seeks prejudgment interest.

*Deformed Tires*

The evaluation of the plaintiff's claim for damages for the tires that were classified as deformed by Smithers Scientific Services is governed by a series of stipulations entered into by the parties. After this Court determines whether the plaintiff failed to mitigate damages and whether the tires that were classified as deformed were permanently deformed, the stipulations permit the Court simply to select the appropriate damage figure.

The plaintiff seeks recovery of $133,290 for 7,273 deformed tires. The defendant challenges both the number of such tires and the salvage recovery built into the dollars claimed.

The evidence shows that 7,273 tires were segregated by all the parties as deformed. However, a suggestion was made by defendant that 2,182 of those tires had regained or with time could regain their proper shape. Plaintiff had attempted to cure the deformations by inflating the tires, mounting them and allowing them to remain in that condition overnight. Then, when the tires were deflated, they regained their original deformed shape. According to a witness for the defendant, 60% of the deformed tires had side wall injury and 50% of these (2,182) had only temporary deformity and in time could be expected to regain proper shapes. Defendant points to the fact that 33 tires were sent for analysis to that witness and, of those, 24 allegedly had regained their proper shape. The defendant's witness used that example in support of his contention.

However, there was no credible evidence presented to demonstrate that the misshapen tires would indeed regain their proper shape over time (which was not defined). The Court finds that the correct number of deformed tires on which plaintiff is entitled to a recovery in this category is the 7,273 tires that had been segregated as deformed by the parties and further that the attempted reduction thereof involved only speculation and was unsupported with acceptable, adequate proof that if allowed to sit in a warehouse for some indefinite time, the tires would regain their proper shapes.

The parties have entered into a stipulation on the amount recoverable by the plaintiff on the 7,273 deformed tires based on whether the fair resale value of "blems"

was 25% or 30% below published list price. A witness for the plaintiff expressed the opinion that the proper discount at which blems are sold in the market is in the range of 10% to 40%, or at an average of 25%. The plaintiff's president, however, in his testimony, fixed the range of a proper discount at 20%–30%.

Defendants also assert that Jako failed to mitigate its damages in the salvage sale of the deformed tires. Plaintiff sold the deformed tires at a discount of 35% off their list price. It did not solicit bids for the tires but simply offered the deformed tires to five tire dealers.

In view of the admission that a 30% discount was an appropriate offering price for blems, the Court finds that this is the discount to be applied. The parties have stipulated that the damages sustained by plaintiff on 7,273 deformed tires, after factoring in appropriate loss of profits, to be as follows, viz., if the Court finds that the plaintiff failed to mitigate its damages by not selling the deformed tires at 30% off its published list prices, the plaintiff's loss for deformation to the 7,273 tires is $73,687.75.

The Court finds that Jako did not make reasonable efforts to sell the tires at the 30% discount that would have been within the accepted range. Accordingly, the plaintiff is entitled to recover $73,687.75 with respect to the 7,273 deformed tires.

*Damaged Tires*

█ The stipulation of the parties did not cover the tires that were destroyed as damaged and unsafe. Plaintiff claims a recovery for these tires in the amount of $22,-907.20, an amount equal to the sum of the cost, freight and duty for all of the tires destroyed. As tires were classified as "damaged" when they were believed to be unsafe for highway use, it was clearly proper to destroy the tires. Smithers Scientific Services determined that 444 tires were damaged and unfit for highway use. Plaintiff only claims damages for 309 destroyed tires. Clearly, this claim is proper and plaintiff is entitled to recover $22,907.20 thereon.

*Expenses of Jako*

█ Jako claims that it incurred certain necessary and reasonable expenses as a result of the loss sustained and that they are entitled to recover them from defendants.

Plaintiff has established that it has reasonably incurred necessary expenses for sorting, handling, testing, segregating, and storing the tires in the amount of $20,-895.08. All of the other expenses claimed by the plaintiff would have been incurred even if the tires had not been damaged by Sanko. The expenses allowed were incidental to the loss.

*The Claims Against the Shipowners*

█ The claims against the shipowners, viz., Sea Fan Transport, Zuito Kaiun, and Sea Bells Transport, are dismissed for lack of privity. The shipowner is not a party to a bill of lading and is not liable for damage to the cargo unless the shipowner authorizes the charterer to sign the bill of lading in its behalf. As no evidence appears in the record to demonstrate such authorization, the claims against the shipowners are dismissed. *See Demsey v. Sea Star,* 461 F.2d 1009 (2d Cir.1972).

In sum, plaintiff has established a claim for $117,490.03, for which sum judgment is awarded to plaintiff against the defendant Sanko, together with 6% simple interest from the date of the commencement of this action, July 14, 1980. This date is selected as the equitable date for the commencement of interest as the plaintiff did not show when it paid for the tires and under all the other facts and circumstances of this case. Costs are to be taxed by the Clerk of the Court against defendant Sanko.

SO ORDERED.