**BOSUNG INDUSTRIAL CO. and Dong Bo Sangsa Co., Ltd., Plaintiffs,**

v.

**M.V. "AEGIS SONIC", her engines, boilers, etc., Maritime Transport Overseas, Inc., Atlanta Shipping Corporation, Alkivides Shipping Enterprises, Inc. and Aegis Shipping Co., Ltd., Defendants.**

and

**MARITIME TRANSPORT OVERSEAS, INC., and Atlanta Shipping Corporation, Defendants and Third-Party Plaintiffs,**

v.

**UNITED TERMINALS, INC., Third-Party Defendant.**

**No. 80 Civ. 2880 (JES).**

United States District Court, S.D. New York.

July 18, 1984.

Halley & Chalos, New York City, for plaintiffs; Albert J. Avallone, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for defendants Atlanta Shipping Corp. and Maritime Transport Overseas, Inc.; Donald Burke, Jane Elizabeth Lawson, New York City, of counsel.

Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zambito, New York City, for third-party defendant United Terminals, Inc.; Robert J. Giuffra, New York City, of counsel.

## OPINION & ORDER

SPRIZZO, District Judge:

Plaintiffs, Bosung Industrial Company, Ltd. (now known as Woochang Construction Company) and Dong Bo Sangsa Company, Ltd., commenced this action pursuant to this Court's admiralty and maritime jurisdiction, 28 U.S.C. § 1333 (1982), seeking to recover under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. §§ 1300–1315 (1976), for damage to a cargo of concrete pipe. The pipe was shipped on March 14, 1979 from Port Newark, New Jersey to Dammam, Saudi Arabia aboard the vessel "Aegis Sonic." Defendants are the charterer of the vessel, Atlanta Shipping Corporation, and its agent, Maritime Transport Overseas, Inc. (now known as Atlanta Maritime Corporation) (collectively referred to as "Atlanta").[1] The action was tried be-

---

**1.** In order to simplify a complex purchase and buy-back transaction, the parties stipulated at trial that Bosung and Dong Bo would together constitute the cargo interest in the consignment of concrete pipe and would have joint and several rights and liabilities on the claims and counterclaims in this action. Trial Transcript ("Tr.") at 8–9. This opinion will refer to the plaintiffs collectively as "Bosung." In addition, Atlanta stipulated that it, as carrier, issued a clean bill of lading with respect to the shipment. Tr. at 12.

Plaintiffs also sued the shipowner, Alkivides Shipping Enterprises, Inc., and its agent, Aegis Shipping Company, Ltd. That action was voluntarily dismissed at trial, and cross-claims between the charterer and the owner were withdrawn. Tr. at 165–66, 168–69. Plaintiffs withdrew their claim against United Terminals, Inc. ("United Terminals"), the stevedore that loaded

fore this Court, and the parties have submitted post-trial briefs and proposed findings of fact and conclusions of law.

## FACTS

On March 1, 1979, Bosung purchased reinforced and nonreinforced concrete pipe of varying lengths and diameters from Kerr Concrete Pipe Company ("Kerr") at a cost of $91,616.65. Exhs. 5, 27.[2] It was to be used as drainage pipe for a state guest house project in Riyadh, Saudi Arabia. Also on March 1, 1979, Bosung and Atlanta entered into a booking note, which provided for the shipment of Bosung's pipe from Newark, New Jersey to Dammam, Saudi Arabia on board the "Aegis Sonic."[3] Exh. 37.

Kerr trucked the pipe from its factory in Hammonton, New Jersey to Port Newark. Bosung's representatives inspected the pipe at the pier and discovered that some of it was missing or damaged. Kerr replaced the damaged and short-delivered pieces at no cost to plaintiffs. United Terminals then loaded the pipe on board the vessel between March 12 and March 14, 1979 under the supervision of Captain Jorg Remy, Atlanta's Port Captain. On March 14, Atlanta issued a clean bill of lading for the carriage of "818 pcs. concrete pipe."[4] Exhs. 3, 3a.

On March 14, 1979, the "Aegis Sonic" departed from Port Newark and proceeded to Port Hamilton, Bermuda where, from March 17 through March 29, other cargo destined for the Middle East was loaded on board.[5]

The "Aegis Sonic" left Bermuda on March 29 and then sailed past Dammam, Saudi Arabia (the destination of plaintiffs' pipe) to Basrah, Iraq, in order to discharge the cargo that had been loaded in Bermuda. It arrived in Basrah on April 27; however, due to port congestion, unloading was not completed until May 23. The ship finally arrived at Dammam on May 23 and proceeded to discharge plaintiffs' shipment of concrete pipe. On May 24, the Dammam Port Authority halted the discharge with approximately fifty percent of the pipe discharged and on the pier.

Bosung was not notified of the vessel's arrival until after port officials had stopped the discharge of its cargo.[6] Bosung's representative, Mr. Ku Hyung Chang, then informed Atlanta that he would not consider accepting delivery of the cargo until it was inspected. Exh. 6. Mr. Chang arrived from Riyadh on May 25 with an independent surveyor from Lloyd's of London, Captain Habib Ali Al-Aidroos, defendants' representative, Mr. Pierre Duchemin, and two other Bosung employees. A survey performed by Captain Al-Aidroos showed that eighty-five to ninety percent of the pipe was damaged by chipping at the ends,

---

the pipe in Newark; however, Atlanta's third party indemnification claim against United Terminals remains. Tr. at 166.

2. Numerals refer to those exhibits introduced by plaintiffs; letters indicate those introduced by defendants.

3. The booking note provided for the carriage of "minimum 60,000 cu. ft. consisting of about 48,000 cu. ft. concrete pipe/10,000 cu. ft. PVC pipe/10,000 cu. ft. conduit pipe." Exh. 37. It also provided for the issuance of a bill of lading, the terms and conditions of which were incorporated into the booking note.

4. Bosung only shipped 56,488 cubic feet of pipe —3,512 cubic feet less than the amount called for in the booking note. Atlanta has counterclaimed for deadfreight in the amount of $4,282.01 plus interest due to Bosung's short shipment.

5. The cargo loaded in Bermuda had formerly been upon the "Mari Boeing," a vessel on charter to Atlanta which had run aground off the coast of Bermuda. To facilitate that loading, some of plaintiffs' cargo was restowed; it is unclear whether any of the pipe was significantly damaged as a result. Upon completion of the loading operations in Bermuda, the vessel was loaded to capacity.

6. The discharge was apparently halted because the Dammam Port Authority did not permit damaged cargo to be unloaded onto the pier; instead, it required the consignee of damaged cargo to accept direct delivery onto trucks. Since Bosung had not been notified of the vessel's arrival at the time the discharge was stopped, it obviously was not in a position to take direct delivery of the cargo.

cracking, and crushing, and that only a small portion of the smaller diameter pipe had escaped damage. Exh. 9.

After inspecting both the pipe on the pier and that on the vessel, and after consulting with the project engineers, Mr. Chang informed defendants that the pipes were totally damaged and useless to plaintiffs and that he would therefore not accept delivery. The parties thereafter entered into several days of negotiations, during which Bosung unsuccessfully sought to obtain from defendants an adequate guarantee.

Pursuant to those negotiations, a joint committee was formed and met on May 30 to inspect the cargo on the pier; however, it was unable to resolve the dispute.[7] On June 2, defendants reloaded the pipe on board the "Aegis Sonic" and sailed to Sharjah, United Arab Emerates, where it was ultimately abandoned on June 5. A survey performed in Sharjah, at Atlanta's request, found eighty-five to ninety percent of the pipe to be damaged at the time of its discharge in Sharjeh.[8] Exh. BBB.

Nine months later, plaintiffs purchased asbestos cement pipe in Saudi Arabia as a substitute for the consignment of concrete pipe. Plaintiffs then commenced this action to recover the cost of the replacement pipe. Atlanta counterclaimed for $81,-654.84 to compensate it for the expenses it incurred as a result of Bosung's refusal to accept the pipe and for $4,282.01 in deadfreight.[9]

## DISCUSSION

■ The case is governed by COGSA since a bill of lading was issued as part of the contract of carriage.[10] *See* 46 U.S.C. §§ 1300, 1301(b). Under COGSA, the shipper establishes a *prima facie* case by showing that the carrier received the cargo in good condition and that the cargo was in a damaged condition when discharged from the vessel. *Westway Coffee Corp. v. M.V. Netuno*, 675 F.2d 30, 32 (2d Cir.1982); *see Caemint Food, Inc. v. Brasileiro*, 647 F.2d 347, 351–52 (2d Cir.1981). The burden then shifts to the carrier to prove that the loss or damage falls within one of the exceptions to COGSA set forth in 46 U.S.C. 1304(2). *Westway Coffee Corp. v. M.V. Netuno, supra*, 675 F.2d at 32; *Vana Trading Co. v. S.S. "Mette Skou,"* 556 F.2d 100, 105 (2d Cir.), *cert. denied*, 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977).

### The Condition of the Cargo When Delivered to the Carrier

■ Atlanta issued a clean bill of lading for the cargo. Exhs. 3, 3a. The issuance of a clean bill of lading is *prima facie* evidence, subject to rebuttal, of delivery of the cargo to the carrier in good condition.

7. The joint committee was headed by Mr. Mushari Abdul Aziz—a representative of the Dammam Port Authority; Mr. Chang and Mr. Duchemin were also members. After concluding that some of the pipe was undamaged, Exh. Z, Mr. Mushari indicated to Mr. Chang that the normal procedure was for the consignee to clear the cargo through customs, truck the pipe out of the port area, and enter a claim with its insurance company. Bosung, however, declined to adopt that procedure. Defendants argue that the joint committee was formed at Bosung's suggestion and that plaintiffs agreed to be bound by its directions. Defendants' Post-Trial Memorandum at 17; Defendants' Proposed Findings of Fact Nos. 29–32. The evidence, however, does not support such a finding.

8. Atlanta argues that this survey report does not bear on the question of whether the pipe was damaged when the vessel arrived in Dammam because the pipe had been partly discharged and then reloaded. Defendants' Post-Trial Memorandum at 19, 23. The Court, however, finds the survey to have some relevance on that issue. First, defendants had presumably taken care in reloading the pipe since they apparently offered twice to discharge the pipe after it had been reloaded. *Id.* at 19; *see* Duchemin Deposition at 57. Second, the pipe that had not been discharged and reloaded was also found to be damaged when unloaded in Sharjeh. Exh. BBB.

9. The counterclaim for $81,654.84 encompasses $55,755.17 in costs arising from delays to the vessel at Dammam and Sharjah and $25,899.67 in various other extra charges.

10. The booking note and the bill of lading together constitute the contract of carriage. *See Hellenic Lines, Ltd. v. United States*, 512 F.2d 1196, 1207–08 (2d Cir.1975).

*Caemint Food, Inc. v. Brasileiro, supra,* 647 F.2d at 352; *Madow Co. v. S.S. Liberty Exporter,* 569 F.2d 1183, 1185 (2d Cir. 1978). Furthermore, Bosung presented evidence that the pipe was inspected at Port Newark and that any damaged pieces that were discovered were replaced with pieces in good condition. In addition, the supervisor of the stevedores at Port Newark testified that he inspected the pipe and saw no damage after the replacement.

■ The only evidence presented that the pipe was not in good condition was the testimony of Captain Remy that forty percent of the pipe had suffered "minor" damage, i.e., chips and scratches, and that seventeen large pieces were badly damaged. However, that alleged damage was not referred to in Captain Remy's original report, dated March 30, 1979.[11] Indeed, this testimony was based on a supplemental report written at the request of Atlanta after Bosung had rejected the delivery in Dammam and after a litigation motive existed. Exh. FFF. Moreover, the supplemental report was prepared from notes which were discarded by Captain Remy and were not available either at trial or at his deposition. As a consequence, the Court finds that Captain Remy's testimony is not sufficient to rebut plaintiffs' showing that the cargo was delivered in good condition.

## The Condition of the Cargo in Saudi Arabia

■ It is clear that the pipe was damaged when it arrived at Damman. Bosung's surveyor at Dammam, Atlanta's surveyor at Sharjeh, and both experts at trial found the pipe to be damaged.[12] It follows that plaintiffs have established their *prima facie* case. Defendants have introduced no evidence to show that the damage resulted from an excepted cause under COGSA.[13] Bosung is therefore entitled to recover for its loss.

■ Defendants, however, assert that the cargo was not damaged to such an extent that Bosung had the right to refuse to accept delivery.[14] Atlanta further argues that since Bosung should have accepted the cargo and pursued its rights against the carrier for any alleged damages, Bosung's wrongful refusal to take delivery

**11.** While this report does refer to some damage caused by forklifts, Exh. EEE, Captain Remy later described that damage as negligible. *See* Exh. FFF.

**12.** In fact, at oral argument, Atlanta's counsel admitted that the pipe was damaged. Transcript of Oral Argument at 26.

**13.** In their post-trial papers, defendants do not even argue that this damage falls within one of COGSA's exceptions. They do, however, make note of the fact that 160 pipes (approximately 13.5% of the total shipment) were "green," i.e., incompletely cured, when loaded in Newark. Defendants argue that, although those pipes required special handling, Bosung failed to so instruct Atlanta or the stevedores. Defendants' Proposed Findings of Fact Nos. 13, 15.

To the extent that Atlanta's mention of the green pipes might be construed as an assertion that they contained an inherent vice, *see* Pre-Trial Order para. 8(c)(3), that argument lacks merit. In order for Atlanta to avail itself of the inherent defect exception, 46 U.S.C. § 1304(2)(m), the green condition of those pipes would have to have caused the cargo damage. The evidence does not support that inference. Were there a connection between the alleged green condition of the pipes and the subsequent damage, it would be reasonable to expect that the green pipes would have suffered damage to a greater extent than the balance of the cargo. However, this was not the case.

**14.** Defendants also contend that the pipe did not conform to the specifications for its intended use and that plaintiff's damage claim was merely a pretext to reject it. The Court rejects that argument as not supported by the evidence. The pipe shipped was clearly consistent with the specifications, which provided for three different methods of sealing the pipe joints, any of which were adequate. Exh. 47. The Court therefore rejects the testimony of Atlanta's expert that the pipe was unsuitable for the sandy environment of Saudi Arabia because that opinion was based on the erroneous assumption that no sealant would be used to connect the pieces of pipe.

The fact that the replacement pipe ordered by plaintiffs was of a higher quality and approximately fifty percent more expensive than that originally shipped is irrelevant. Plaintiffs' managing director testified that the replacement pipe was the only type manufactured in Saudi Arabia and that its cost was less than the cost of purchasing concrete pipe elsewhere and shipping it to Saudi Arabia.

entitles it to recover on its counterclaim for $81,654.84.

The duty of the consignee of goods transported by a carrier to accept delivery thereof is not ordinarily excused by the fact that the goods are damaged, unless such damage renders the property practically valueless, having regard to the expense of acceptance and use, and to the purpose for which it was intended. J. Miller, *Law of Freight Loss and Damage Claims* § 506.1 (2d ed. 1961); *see also Fraser-Smith Co. v. Chicago, Rock Island & Pacific Railroad Co.*, 435 F.2d 1396, 1399 (8th Cir.1971); *T.J. Stevenson & Co. v. 81,193 Bags of Flour*, 449 F.Supp. 84, 124 (S.D.Ala.1976), *aff'd in part and rev'd in part*, 629 F.2d 338 (5th Cir.1980); *Cargill, Inc. v. S/S Nasugbu*, 404 F.Supp. 342, 349 (M.D.La.1975); *Compagnia Di Navigazione Mauritius Rome v. Kulukundis*, 182 F.Supp. 258, 263 (E.D.N.Y.1959).

■ Applying the above standard, the Court finds that plaintiffs were not obliged to accept the pipe because it was "practically valueless." The surveys conducted at Dammam and Sharjeh revealed nearly total damage to the pipe. Exhs. 9, BBB. Furthermore, Mr. Duchemin, Atlanta's representative in Saudi Arabia, admitted that the "complete shipment" was damaged. Exh. H.

Bosung's representative, Mr. Chang, after speaking to the engineers at the jobsite, determined that the cost involved in accepting and then trucking the damaged pipe to Riyadh, amounting to approximately $40,000.00, far outweighed the value of the pipe in its damaged condition. That decision was entirely correct. Moreover, an entire set of uniform pipe was required for the construction project and the approximately ten to fifteen percent of pipe that was undamaged was therefore useless to Bosung.

The only evidence presented by Atlanta to show that the pipe was not totally useless was the testimony of its expert, Alfred E. Pagan. Mr. Pagan testified that, although some of the pipes were damaged, they could easily be repaired at the jobsite with mortar.

That testimony, however, was rebutted by Bosung's expert, Robert E. Bald. Mr. Bald testified that the repair operation suggested by Mr. Pagan would be expensive and time-consuming, and would require careful preparation of surfaces by constant soaking and watering during the repair process. He also testified that those difficulties would be compounded by the unusually dry environment in Saudi Arabia, which would cause dry shrinkage and increase the difficulty of obtaining a solid bond between the old and the new concrete. The Court finds that the testimony of plaintiffs' expert is more reasonable and more persuasive, and therefore rejects the testimony of defendants' expert.

Having considered the extremely high percentage of damage, the cost of having to transport the pipe to the jobsite, and the expense and difficulty, if not impossibility, of repairing it, the Court finds that Bosung acted reasonably in refusing to accept delivery of the pipe. Plaintiffs are therefore entitled to recover damages for the total loss of the consignment of pipe.

*Damages*

■ Ordinarily, the measure of damages under COGSA is the difference between the market value of the shipment at destination had it arrived in good condition and its market value as damaged. *Pacol (Canada) Ltd. v. M/V Minerva*, 523 F.Supp. 579, 581–82 (S.D.N.Y.1981); *C. Itoh & Co. (America), Inc. v. Hellenic Lines, Inc.*, 470 F.Supp. 594, 598 (S.D.N.Y.1979); *see Encyclopedia Britannica, Inc. v. S.S. Hong Kong Producer*, 422 F.2d 7, 18 (2d Cir. 1969), *cert. denied*, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970). The fair market value rule, however, is not the sole method for computing damages, and alternative methods may be used in order to adequately compensate a plaintiff for its loss. *Pacol (Canada) Ltd. v. M/V Minerva*, *supra*, 523 F.Supp. at 582; *Interstate Steel Corp. v. S.S. "Crystal Gem,"* 317 F.Supp. 112, 121 (S.D.N.Y.1970); *see Inter-*

*natio, Inc. v. M.S. Taimyr,* 602 F.2d 49, 50 (2d Cir.1979).

 Since the concrete pipe was totally useless as delivered, plaintiffs are entitled to recover its replacement cost. *Cf. Waterman S.S. Corp. v. United States Smelting, Refining & Mining Co.,* 155 F.2d 687, 694 (5th Cir.1946); *Kerr-McGee Refining Corp. v. M/V La Libertad,* 529 F.Supp. 78, 85 (S.D.N.Y.1981). That cost is the price of the asbestos cement pipe purchased in Saudi Arabia as a substitute for the damaged concrete pipe.[15] The fact that the replacement pipe was more expensive and of higher quality than the original pipe is of no consequence. The cost to Bosung of purchasing concrete pipe in the United States and then shipping it to Saudi Arabia would have exceeded the cost of the replacement pipe. Therefore, plaintiffs acted in a commercially reasonable manner in choosing the least expensive means of obtaining a replacement for the damaged pipe.

### Counterclaims

 It follows from the Court's finding that Bosung was justified in refusing to accept delivery of the pipe that Atlanta's counterclaim for $81,654.84 in delay and other expenses must be dismissed. Defendants may, however, recover $4,282.01 plus interest on their counterclaim for deadfreight. Since Bosung shipped 3,512 cubic feet less than it booked, it breached the contract of carriage and is liable for the shortage.

The Court is not persuaded by plaintiffs' argument that the fact that the ship was loaded to capacity in Bermuda defeats defendants' claim for deadfreight. The burden of showing that defendants suffered no deadfreight loss is on the plaintiffs, and Bosung failed to elicit any evidence that Atlanta recovered sufficient revenues from the other cargo loaded to offset its claim for deadfreight.

### Third Party Claim

 The only evidence that Atlanta has introduced to support its claim against United Terminals, the stevedore, is the testimony of Captain Remy that seventeen pieces were badly damaged during the loading operation. As the Court has already indicated, *supra* at 5, that testimony is not persuasive. While Captain Remy's initial report refers to some forklift damage, it is clear that that damage was negligible. *See* Exhs. EEE, FFF. The third party claim against United Terminals must therefore be dismissed.

### CONCLUSION

Plaintiffs are entitled to judgment against defendants in the amount of $177,864.83. Pre-judgment interest is awarded from the date the replacement pipe was purchased at a rate of ten percent. Defendants' counterclaim for $81,654.84 in expenses incurred as a result of plaintiffs' refusal to take delivery is dismissed. Defendants are entitled to judgment in the amount of $4,282.01, plus interest at ten percent from March 14, 1979, on their counterclaim for deadfreight. Defendants' third party claim against United Terminals is dismissed.

The foregoing shall constitute the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a). The parties are directed to prepare and submit a joint proposed judgment to the Court within fifteen days of the date of this decision.

It is SO ORDERED.

---

**15.** The replacement pipe was purchased for 590,511.25 Saudi riyals ("SR"), or $177,864.83. Exh. 0000. The applicable exchange rate is 3.32 SR per dollar, the rate at the time of purchase. *See Phillip Holzman v. S.S. Hellenic Sunbeam,* 1977 A.M.C. 1731, 1734 (S.D.N.Y.1977).