**AFFILIATED FOODS, INC., Plaintiff,**

v.

**PUERTO RICO MARINE MANAGEMENT, INC. and/or Puerto Rico Maritime Shipping Authority, Defendants.**

Civ. No. 84–1105CC.

United States District Court,
D. Puerto Rico.

Oct. 15, 1986.

Angel Tapia-Flores, San Juan, P.R., for plaintiff.

Juan A. López-Conway and J. Ramón Rivera-Morales Jiménez, Graffam & Lausell, San Juan, P.R., for defendants.

## OPINION AND ORDER

CEREZO, District Judge.

This is an action in admiralty under the Carriage of Goods by Sea Act, 42 U.S.C. section 1300, *et seq.* (COGSA) removed to this Court pursuant to 28 U.S.C. section 1337. Although defendants have admitted that they breached the contract of carriage between the parties, they have always con-

tested the extent of damages for which they may be held liable. The dispute has focused on whether defendants may be held liable for the cost of alternate air transportation that plaintiff incurred when it sent a substitute shipment of produce to a third party consignee cruise ship. Evidence was presented by both parties in the form of testimony and documents. Having considered the same, the court makes the following findings of fact and conclusions of law.

Plaintiff, a Miami-based produce wholesaler that mainly serves the hotel, restaurant and cruise ship markets, entered into a contract with defendants on September 12, 1983 for the ocean transportation of approximately 33,000 pounds of assorted fruits and vegetables from Florida to St. Thomas, U.S. Virgin Islands. On prior occasions defendants had carried similar shipments, ultimately destined for cruise ships, for plaintiff and others. Mr. Jesse Pérez, defendants' cargo booking agent, was made aware during a telephone conversation with plaintiff's agent when the terms of the contract were being made that the produce was destined for consumption aboard the cruise ship TSS FARISEA docked at St. Thomas and that it was important that the produce arrive on time. Mr. Pérez indicated that they had two sailing schedules from Florida to St. Thomas with a stop-over at San Juan, Puerto Rico. He suggested the one scheduled to arrive earlier at St. Thomas, but stated that he could not guaranty delivery at a specific time or place. Plaintiff then requested the route recommended by Mr. Pérez as the one that would arrive first in time. The produce was shipped on Friday, September 16, 1983 in a refrigerated trailer-type van and was due to arrive at St. Thomas on Thursday, September 22, 1983. On Sunday, September 25, 1983, when the trailer van sent to St. Thomas and marked as plaintiff's shipment was opened, it contained only cheese and no produce. Plaintiff made efforts to contact defendants, but

to no avail. Since the TSS FARISEA was to sail that same Sunday at midnight and there was no local supplier who could produce such a large amount of fruits and vegetables in a few hours, the people from the cruise ship threatened to sue plaintiff if the produce was not obtained in time for their cruise. Plaintiff appeased them by promising that the produce would arrive on time a few days later at their next port-of-call in Aruba, Netherland Antilles. Plaintiff then collected the same order of produce at its Miami warehouse and shipped it by air to Aruba. The cargo arrived on time and the cruise ship people, presumably, did not sue. Plaintiff was finally able to reach defendants the following day, Monday and, after investigating the matter, defendants accepted that due to their mistake the van with plaintiff's produce had been mislabeled and had remained at the stop-over point in San Juan while another van was erroneously sent to St. Thomas. The produce remained at San Juan and was eventually rejected by plaintiff due to spoilage. Defendants reimbursed plaintiff for the ocean freight paid some $3,000, and the cost of the produce, approximately $13,500, but not the alternate air transportation, $13,600, and incidental expenses.

■ Before engaging in the legal causation analysis required in this case, it is important that certain basic facts be clarified so as not to drift in the maze of impressive, but hollow, legal terminology. It is important to understand that the item claimed as damages is really the cost of the effort made by plaintiff to prevent further damages from occurring, or, as this concept is called, mitigation expenses. *See gen.* 5A, *Corbin on Contracts,* section 1044 (1964). Plaintiff is correct in asserting that it had a general duty to mitigage damages, 2, Sorkin, S. *How to Recover for Loss or Damage to Goods in Transit,* section 11.08 (1985), and that mitigation expenses are generally recoverable from the wrongdoer. *Id.*[1] However, it is a mistake

---

1. Mitigation expenses also have to meet a criteria of reasonableness before they can be recovered. *Corbin, supra.* However, in the present

case defendants have not challenged this aspect of the mitigation expenses claimed. They have not disputed that the air transport of produce

to think that by merely placing the "mitigation" label on any expense incurred an injured party is entitled to recover it. Plaintiff cannot escape the burden of proving that the losses sought to be avoided were caused, or would have been caused, by defendants' breach. *See gen.* 5, *Corbin on Contracts,* section 1044 (1964); 4, *Williston on Contracts,* section 1353–54 (1968). In other words, before being entitled to recover mitigation expenses, plaintiff must first prove that the losses sought to be avoided or reduced through its efforts were indeed causally connected to defendants' breach. *Id.* Finally, on the matter of the contractual breach, the evidence and stipulated facts reveal that the produce deteriorated during the delay and was rejected as spoiled. Defendants' conceptualization of its breach as being merely a few-days-delay in delivery, based on its unsupported contention that the produce could have been sent to St. Thomas on the next scheduled trip a few days later, is distracting. It seems to imply that it did not really breach the contract of carriage given its duty to deliver only within a reasonable period of time, *see Chicago & Alton R.R. Co. v. Kirby,* 225 U.S. 155, 164–65, 32 S.Ct. 648, 649–50, 56 L.Ed.2d 1033 (1912), and does not find support in the record. The record shows that the breach lies in the failure to deliver the produce. Having made these clarifications, we turn to the factual issues: whether the failure to deliver the produce at the port of destination legally caused or could have caused the potential damages that plaintiff avoided which stemmed from the cruise ship's threats to sue plaintiff when the foodstuffs were not delivered before departure.[2]

The general formula applied in admiralty cargo-claim cases to determine the extent of contractual damages a carrier may be held liable for is the market value of the goods shipped at port of destination. *See e.g. Santiago v. Sea-Land Service, Inc.,* 366 F.Supp. 1309, 1314 (D.P.R.1973). This general formula is applied in most cargo claims with some variations, depending on whether the goods arrived damaged or if they arrived late, *id.* The market value formula, however, is not the only measure of damages that may be applied in maritime cargo claims to ascertain the loss that may be recovered. *See Héctor Martínez & Co. v. Southern Pacific Transp.,* 606 F.2d 106, 110 (5th Cir.), *reh. denied,* 609 F.2d 1008 (1979), *cert. denied,* 446 U.S. 982, 100 S.Ct. 2962, 64 L.Ed.2d 838 (1980); *Bosung Industrial Co. v. M.V. Aegis Sonic,* 590 F.Supp. 908, 914 (S.D.N.Y. 1984); *Dixie Plywood Company v. S.S. Federal Lakes,* 404 F.Supp. 461, 465 (S.D. Ga.) *aff'd.* 525 F.2d 691 (5th Cir.1975), *cert. denied* 425 U.S. 974, 96 S.Ct. 2174, 48 L.Ed.2d 798 (1976). Since COGSA only gives a general command that "[i]n no event shall the carrier be liable for more than the amount of damage actually sustained" 46 U.S.C. section 1304(5), and no specific formula to measure damages is adopted by the statute, *compare* U.C.C. section 2–715, the essential purpose of any rule of damages, that the loss suffered be compensated and the injured party be made whole, is the guiding principle. The market value formula is only a method to carry out this essential purpose, *idem, and Pacol (Canada) Ltd. v. M/V Minerva,* 523 F.Supp. 579, 582 (S.D.N.Y.1981). There may be situations where the market value standard is inadequate to assess the loss suffered and another method may be used. *Idem.* One such method is that set forth in the leading English case of *Hadley v. Baxendale,* 9 Ex. 341, 156 Eng.Rep. 145 (1854). This method takes into account whether

---

from Florida and incidental expenses, at a cost equal or greater than that of the produce itself, was the only reasonable alternative to prevent further loss. Although defendants commented on the fact that plaintiff did not open the trailer van until Sunday even though it had arrived at St. Thomas the previous Thursday, no evidence was presented to show that an earlier detection would or should have enabled plaintiff to collect a new order of produce from other sources, or from what was salvageable from the van left in San Juan, and deliver it to the cruise ship before Sunday night at a cost lower than the air fare from Miami to Aruba.

2. Defendants do not dispute the existence of the threat.

the breaching party had reason to foresee at the time the contract was made that the particular loss claimed would be a probable result of its breach, *id.;* Restatement (Second) of Contracts, section 351 (1981). Because of its clarity, we cite the often-quoted passage by Baron Alderson from *Hadley v. Baxendale* where the contractual[3] foreseeability-of-damages doctrine is aptly described:

> Now we think the proper rule in such a case as the present is this:—Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i.e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it. Now, if the special circumstances under which the contract was actually made were communicated by the plaintiffs to the defendants and thus known to both parties, the damages resulting from the breach of such a contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated. But, on the other hand, if these special circumstances were wholly unknown to the party breaking the contract, he, at the most, could only be supposed to have had in his contemplation the amount of injury which would arise

generally, and in the great multitude of cases not affected by any special circumstances, from such a breach of contract. For, had the special circumstances been known, the parties might have specially provided for the breach of contract by special terms as to the damages in that case; and of this advantage it would be very unjust to deprive them..... Now, in the present case, if we are to apply the principles above laid down, we find that the only circumstances here communicated by the plaintiffs to the defendants at the time the contract was made, were, that the article to be carried was the broken shaft of a mill, and that the plaintiffs were the millers of that mill. But how do these circumstances shew reasonably that the profits of the mill must be stopped by an unreasonable delay in the delivery of the broken shaft by the carier to the third person? Suppose the plaintiffs had another shaft in their possession put up or putting up at the time, and that they only wished to send back the broken shaft to the engineer who made it; it is clear that this would be quite consistent with the above circumstances, and yet the unreasonable delay in the delivery would have no effect upon the intermediate profits of the mill. Or, again, suppose that, at the time of the delivery to the carrier, the machinery of the mill had been in other respects defective, then, also the same results would follow. Here it is true that the shaft was actually sent back to serve as a model for a new one, and that the want of a new one was the only cause of the stoppage of the mill, and that the loss of profits really arose from not sending

---

**3.** Some courts have suggested that, where liability is based on tort, a wider scope of foreseeability of damages may be applied because the duties arising from a contract should be limited by the terms and conditions contemplated and agreed upon by the parties which may sometimes be less than the usual duties and liabilities imposed by the law of torts. *See Ohoud Establishment, etc. v. Tri-State Contracting,* 523 F.Supp. 249, 256, n. 4 (D.N.J.1981). It may be that the concept of foreseeability in torts is used for a different purpose than that for which it is used in contract law, *see Corbin supra,* sections 1008, 1019, (foreseeability in torts is used to measure whether an individual's acts were prudent or not). In the present case, we need not discuss the effects of any such difference or whether recovery on torts as an alternate source is permissible, *see Stainless Steel & Metal Mfg. v. Sacal V.I., Inc.,* 452 F.Supp. 1073 (D.P.R.1978), for plaintiff, although labeling its action as one in tort and contract in the headings of its motions, has admitted in the pretrial order that its action was one in contract and has so conducted its litigation. *See Hernández v. Alexander,* 671 F.2d 402, 407 (10th Cir.1982).

down the new shaft in proper time, and that this arose from the delay in delivering the broken one to serve as a model. But it is obvious that, in the great multitude of cases of millers sending off broken shafts to third persons by a carrier under ordinary circumstances, such consequences would not, in all probability, have occurred; and these special circumstances were here never communicated by the plaintiffs to the defendants. It follows, therefore, that the loss of profits here cannot reasonably be considered such a consequence of the breach of contract as could have been fairly and reasonably contemplated by both the parties when they made this contract. For such loss would neither havé flowed naturally from the breach of this contract in the great multitude of such cases occurring under ordinary circumstances, nor were the special circumstances, which, perhaps, would have made it a reasonable and natural consequence of such breach of contract, communicated to or known by the defendants.

*Hadley,* 156 Eng.Rep. at 151. These common-law principles of contractual damage foreseeability have been followed by federal courts on numerous occasions in cases of contracts of carriage to ascertain loss in addition to the ordinary market value standard. *See for example in addition to the cases above cited, Air Products & Chemicals v. Ill. Cent. Gulf. R.R.,* 721 F.2d 483, 488 (5th Cir.1983), *cert. denied,* 469 U.S. 832, 105 S.Ct. 122, 83 L.Ed.2d 64 (1984) (costs of decontaminating chemical storage tanks awarded as damages because carrier should have foreseen that misdelivery of chemical cargo would ultimately cause contamination of storage tanks), *and see also on contamination damage caused by misdelivery of cargo, Stroh Brewery Co. v. Grand Trunk Western R. Co.,* 513 F.Supp. 827 (E.D.Mich.1981); *Pillsbury Co. v. Illinois Cent. Gulf R.R.,* 687 F.2d 241, 245 (8th Cir.1982) (demurrage charges paid by shipper due to delay caused by fumigation of infested cargo held foreseeable to carrier); *Contempo Metal Furn., etc. v. East Tex. Mtr., etc.,* 661 F.2d 761, 765 (9th Cir.

1981) (labor costs incurred in cutting, bending and chroming steel tubing before discovery that tubing was defective held foreseeable by carrier); *Caspe v. Aaacon Auto Transport, Inc.,* 658 F.2d 613, 617 (8th Cir.1981) (accounting fees incurred to reconstruct financial records kept in trunk of car which was lost by misdelivery held foreseeable to carrier); *Reed v. Aaacon Auto Transport, Inc.,* 637 F.2d 1302, 1305–07 (10th Cir.1981) (expenses incurred in locating and disposing of automobile lost and damaged in transport and in acquiring substitute vehicle held foreseeable to carrier); *L.E. Whitlock Truck Service, Inc. v. Regal Drilling Co.,* 333 F.2d 488, 492 (10th Cir.1964) (carrier held liable for lost profits due to delay in delivery of oil rig); *Hojgaard & Schultz v. Transamerican S.S. Corp.,* 590 F.Supp. 916, 925 (S.D.N.Y.1984) *aff'd.* 762 F.2d 990 (2d Cir.1985) (in action for damage to cargo of pre-fabricated houses destined to be used as temporary housing for employees in a Saudi Arabia construction project, the amount spent on a substitute camp to house the employees until the damaged cargo was repaired, held to have been foreseeable to carrier and awarded as damages); *Jako Marketing Corp. v. M.V. Sea Fan,* 557 F.Supp. 1244, 1249 (S.D.N.Y.1983) (expenses for sorting, handling, testing, segregating and storing a shipment of damaged tires held recoverable from carrier); *Turner's Farms, Inc. v. Maine Cent. R. Co.,* 486 F.Supp. 694, 700 (D.Maine 1980) (lost profits resulting from failure to deliver "reasonable dispatch" awarded as damages). In most of these cases the determination of foreseeability has rested on whether, from the information exchanged when the contract was formed or through other circumstances for which one may assume that the parties possessed certain information (i.e., a carrier experienced in a very specialized type of transportation), it is reasonable to assume that the parties contemplated a type of special transportation arrangement which, if breached, could give rise to a series of additional damages beyond those which the contracting parties know or have reason to

know will ordinarily flow from a breach of the contract of carriage. An implicit tenement of this doctrine is the acceptance by both parties of the special information that will become, when so accepted, the special conditions of the contract giving rise to the additional foreseeable consequences.

Defendants point to the exchange of information made during the booking of the shipment and argue that because their agent Jesse Pérez was never made aware of any special circumstances, such as, the cruise ship's itinerary, its food inventory or the lack of any alternate source in St. Thomas or a nearby island which could produce the 33,000 pounds of fruits and vegetables on short notice, or the terms of the contract between plaintiff and the cruise ship, it could not have foreseen, nor is it reasonable to assume that it should have foreseen, that its failure to deliver could result in potential litigation by a third party against plaintiff. On the other hand, plaintiff argues that, since defendants knew that the produce was being shipped to a cruise ship for consumption on board and since they had prior experience on this same type of carriage, they should have foreseen that failure to deliver would expose plaintiff to multiple suits. The issue of whether the information provided was sufficient to hold defendants liable for the damages claimed, *compare Héctor Martínez*, 606 F.2d at 110 ("general rule does not require the plaintiff to show that the actual harm suffered was the most foreseeable of possible harms") *with Evra Corp. v. Swiss Bank Corp.*, 673 F.2d 951, 959 (7th Cir.1982) *cert. denied*, 459 U.S. 1017, 103 S.Ct. 377, 74 L.Ed.2d 511 (general foreseeability present in most cases is not enough) need not be decided, for the undisputed[4] assertions of defendants' agent in the sense that during the booking he made it clear to plaintiff's agent that delivery of the produce at a certain time or place could not be guaranteed, negates the possibility that any special circumstances, communicated by plaintiff to defendants, can be considered as having been "contemplated" by both parties. If plaintiff felt time was of such importance,[5] when Mr. Pérez told its agent that he could not guarantee time and place of delivery, it should have secured this guarantee from defendant, or, if not possible due to carrier tariff restriction,[6] it should have obtained a carrier who

---

4. Mr. Pérez' testimony on this aspect was emphatic and was never contradicted by plaintiff's witness. There is no reason, supported by the record, why we should disregard it. Plaintiff also failed to present any evidence to show that it was somehow misled by defendants into believing that its concern over time was shared by defendants and that they indirectly promised plaintiff that the produce would arrive on time.

5. It may have been the case that not even plaintiff was aware of the urgency of the situation for its agent testified that he did not know the cruise ship's sailing schedule and waited until Sunday to open the van when the van had arrived on St. Thomas the previous Thursday.

6. Defendants have argued that the tariff applicable to this carriage, which is incorporated as part of the terms of the contract, *see Insurance Co. of North America v. Puerto Rico Marine Management, Inc.*, 768 F.2d 470, 473 (1st Cir. 1985) *cert. denied*, —— U.S. ——, 106 S.Ct. 885, 88 L.Ed.2d 920 (1986), did not contain any promise to deliver goods at a certain time or place and limited damages to those actually suffered by expressly excluding consequential or special damages. It adds that the tariffs and the Interstate Commerce Act prevented it from giving plaintiff any preferential treatment and that any such promise would be null and void. *See Chicago & Alton R.R.*, 225 U.S. at 164, 32 S.Ct. at 649–50. We do not see the question as whether preferential treatment prohibited by the tariff was given, but rather whether certain conditions as to time of delivery, not specifically prohibited by the tariff or the Act, were agreed upon by the parties, as could have been equally agreed on with other shippers at the same rate. In addition, it should be noted that, inasmuch as COGSA does not limit recovery save to the amount of damage actually sustained, if the damage is deemed to have been one foreseeable, then it is considered a loss caused by the breach regardless of its being called consequential or special, *see* Corbin, *supra*, section 998, 1011; Restatement, *supra*, and, thus, the limitation on the tariff with respect to consequential damages may be at odds with COGSA's section 1303(8) prohibiting limitations on the carrier's liability beyond those embodied in COGSA. *See Hanover Ins. Co. v. Shulman Trans. Enterprises, Inc.*, 581 F.2d 268, 274 (1st Cir.1978). The argument, however, that the carrier may not be able to protect itself from the additional liability that these special conditions might generate because of the fixed rates on the tariff, does have some

could make such arrangements. Instead, plaintiff decided to go ahead with defendants' terms and assumed the risk of any other consequential damage that the failure to deliver could cause. Although in *Héctor Martínez* the court made a passing reference to a so-called "modern view" which does not require tacit acceptance of the special information communicated for it to have been considered as having been "contemplated," ergo incorporated, to the contractual understanding and, thus, generate the special consequences, the court was referring to the method for determining the extent of damages in a buyer-seller relationship as provided in the Uniform Commercial Code, U.C.C. section 2–715, which states in part:

"(2) Consequential damages resulting from seller's breach include

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented through cover or otherwise. . . .

The present case, however, is one in admiralty and the contract in question is one of carriage. Although maritime law is no stranger to borrowing concepts from the general common law and other sources, *see East River Steamship Corp. v. Transamerica Delaval, Inc.,* — U.S. —, —, 106 S.Ct. 2295, 2298–99, 90 L.Ed.2d 865 (1986), plaintiff has neither argued nor cited caselaw which incorporates this UCC section to maritime law and to the unique contractual relationship between a shipper and a carrier.[7]

Whatever the case may be, and notwithstanding the fact that the contractual duties and liabilities between a buyer and a seller contemplated by the UCC's modern view are very different from those between a shipper and a carrier, the present case involves an express *rejection* of certain special circumstances by one of the contracting parties and not merely some misunderstanding on whether or not the special circumstances were accepted, tacitly or expressly. What we have before us is a party asking the other during the negotiation of the contract to do something and the other answering that it could not promise such a thing. There was no "meeting of the minds" or acceptance of these special circumstances for they were expressly rejected by one party, *see Central Coast Constr. v. Lincoln-Way Corp.,* 404 F.2d 1039, 1045 (10th Cir.1968), *and gen.* Williston, *supra,* sections 22, 22A, 23, 64. Old is not necessarily bad and in an "old" case, Justice Holmes cautioned: "'knowledge must be brought home to the party sought to be charged, under such circumstances that he must know that the person he contracts with reasonably believes that he accepts the contract with the special condition attached to it.'" *Globe Refining Co. v. Landa Cotton Oil Co.,* 190 U.S. 540, 545, 23 S.Ct. 754, 756, 47 L.Ed. 1171 (1903).

■ We believe this is applicable to the present situation. Otherwise, a party would be able to dictate any terms and conditions it deemed suitable and, therefore, incorporate them unilaterally to a contract merely by communicating them to the other party. In the present case, since the special circumstances that could have established the element of foreseeability were expressly rejected by defendants' agent, they cannot be considered as contemplated. Accordingly, any damages that could have been foreseen are limited to those usually flowing from a breach of a contract of carriage for that was the contract that the parties entered into. Those damages have been fully recovered by plaintiff. The possible loss that was pre-

persuassive force. Nevertheless, we leave for another day the examination of how the tariffs and regulation of ocean carriers by the ICC affect their liability with respect to foreseeable damages, in view of our ruling on other grounds.

7. In fact, some commentators have suggested that this highly regulated relationship is so unique that even the general foreseeability of contractual consequences measure of damages may sometimes be ill-suited to determine loss in maritime cargo cases. *See* Sorkin, *supra,* section 11.10[1]; Corbin, *supra,* section 1013.

sumably prevented by obtaining faster, alternate transportation would not have been caused by defendants' breach and, therefore, these expenses cannot be recovered. The Clerk shall enter judgment for defendants, without imposition of costs or attorney's fees.

SO ORDERED.